STATE OF CONNECTICUT *v.* ALEX SOSTRE
(SC 16670)

Sullivan, C. J., and Borden, Norcott, Katz, Vertefeuille, Zarella and Lavery, Js.

Argued March 12—officially released July 30, 2002

*Michael E. O'Hare*, assistant state's attorney, with whom, on the brief, was *James E. Thomas*, state's attorney, for the appellant (state).

*John Holdridge*, assistant public defender, with whom was *Karen A. Goodrow*, assistant public defender, for the appellee (defendant).

*Opinion*

SULLIVAN, C. J. The sole issue in this appeal is the proper construction of General Statutes § 53a-46a (i) (6),[1] which provides that one of the aggravating factors

---

[1] General Statutes § 53a-46a provides: "(a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of or pleads guilty to a capital felony, the judge or judges who presided at the trial or before whom the guilty plea was entered shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, and any aggravating factor set forth in subsection (i). Such hearing shall not be held if the state stipulates that none of the aggravating factors set forth in subsection (i) of this section exists or that any factor set forth in subsection (h) exists. Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause, or (3) before the court, on motion of the defendant and with the approval of the court and the consent

## to be considered in determining whether a defendant

of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (i) shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the aggravating factors set forth in subsection (i) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury or, if there is no jury, the court shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury or, if there is no jury, the court shall return a special verdict setting forth its findings as to the existence of any factor set forth in subsection (h), the existence of any aggravating factor or factors set forth in subsection (i) and whether any aggravating factor or factors outweigh any mitigating factor or factors found to exist pursuant to subsection (d).

"(f) If the jury or, if there is no jury, the court finds that (1) none of the factors set forth in subsection (h) exist, (2) one or more of the aggravating factors set forth in subsection (i) exist and (3) (A) no mitigating factor exists or (B) one or more mitigating factors exist but are outweighed by one or more aggravating factors set forth in subsection (i), the court shall sentence the defendant to death.

"(g) If the jury or, if there is no jury, the court finds that (1) any of the factors set forth in subsection (h) exist, or (2) none of the aggravating factors set forth in subsection (i) exists, or (3) one or more of the aggravating factors set forth in subsection (i) exist and one or more mitigating factors

convicted of a capital felony shall be sentenced to death is whether "the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value . . . ." The trial court concluded that the aggravating factor applies only to killings that are an essential prerequisite to obtaining something of pecuniary value and, therefore, does not apply to a capital offense committed during the course

exist, but the one or more aggravating factors set forth in subsection (i) do not outweigh the one or more mitigating factors, the court shall impose a sentence of life imprisonment without the possibility of release.

"(h) The court shall not impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict, as provided in subsection (e), that at the time of the offense (1) he was under the age of eighteen years or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (4) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(i) The aggravating factors to be considered shall be limited to the following: (1) The defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony; or (2) the defendant committed the offense after having been convicted of two or more state offenses or two or more federal offenses or of one or more state offenses and one or more federal offenses for each of which a penalty of more than one year imprisonment may be imposed, which offenses were committed on different occasions and which involved the infliction of serious bodily injury upon another person; or (3) the defendant committed the offense and in such commission knowingly created a grave risk of death to another person in addition to the victim of the offense; or (4) the defendant committed the offense in an especially heinous, cruel or depraved manner; or (5) the defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value; or (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value; or (7) the defendant committed the offense with an assault weapon, as defined in section 53-202a." In 2001, the legislature added subdivision (8) to § 53a-46a (i). Public Acts 2001, No. 01-151, §§ 1 and 5.

of a robbery. The state claims on appeal that the statute applies to any capital felony committed with a profit motive, including those committed in the course of a robbery.[2] We conclude that the aggravating factor does not apply to capital felonies committed in the course of a robbery and, accordingly, affirm the judgment of the trial court.

The parties stipulated that the following facts reasonably could be found by a trier of fact. At some point during the evening of January 23, 1999, the defendant, Alex Sostre, and three other individuals went to an apartment building located at 454½ Main Street in East Hartford with the intention of robbing Gregorio Velez, who lived in apartment no. 2. After they broke into Velez' apartment, the defendant and one of the other individuals became involved in a struggle with Velez, during which they assaulted him. The defendant took a handgun from Velez at that time. The defendant also took from Velez the keys to a safe located in the apartment, which the defendant believed contained more than $1000. As the defendant unsuccessfully attempted to open the safe, he heard the sound of a police radio. At that point, he left the apartment and entered the building's common hallway.

Meanwhile, at approximately 9:13 p.m., the East Hartford police department had received a telephone complaint of loud noise at 454½ Main Street. Police officer Brian Aselton and two other police officers responded to the complaint. Upon arrival, the officers were unable to locate a disturbance. Aselton, who was dressed in a

---

[2] General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

police uniform that displayed police patches and a badge, entered the building alone to notify the complainant of the officers' findings and encountered the defendant in the hallway. The defendant shot Aselton in the head with the gun that he had taken from Velez. He then fled from the scene.

At approximately 9:22 p.m., the East Hartford police department received a 911 telephone call from Jose Mulero, who lived in apartment no. 8 at 454½ Main Street. Mulero indicated that a police officer had been injured. Police officers responded to the call and found Aselton wounded and bleeding in the hallway of the apartment building near the door of apartment no. 2. Aselton was taken to Hartford Hospital, where he died as a result of the gunshot wound.

Before the robbery, on January 21, 1999, the defendant had told an acquaintance, Denise Morales, that he was going to commit a robbery and, if a police officer interrupted him, either he would shoot the police officer or the officer would have to shoot him. After the robbery, the defendant told another acquaintance that he had shot Aselton because he did not want to return to jail.

On January 27, 1999, the defendant was arrested and charged with capital felony in violation of General Statutes § 53a-54b (1),[3] murder in violation of General Statutes § 53a-54a,[4] felony murder in violation of General

---

[3] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following: (1) Murder of a member of the Division of State Police within the Department of Public Safety or of any local police department . . . . "

[4] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

Statutes § 53a-54c,[5] kidnapping in the first degree in violation of General Statutes § 53a-92,[6] burglary in the first degree in violation of General Statutes § 53a-101,[7] robbery in the first degree in violation of General Statutes § 53a-134,[8] assault in the first degree in violation of General Statutes § 53a-59,[9] conspiracy to commit bur-

[5] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[6] General Statutes § 53a-92 provides in relevant part: "(a) A person is guilty of kidnapping in the first degree when he abducts another person and: (1) His intent is to compel a third person (A) to pay or deliver money or property as ransom or (B) to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function. . . ."

[7] General Statutes § 53a-101 provides in relevant part: "(a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument, or (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone. . . ."

[8] General Statutes § 53a-134 provides in relevant part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. . . ."

[9] General Statutes § 53a-59 provides in relevant part: "(a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument;

glary in the first degree in violation of General Statutes §§ 53a-48[10] and 53a-101, larceny in the second degree in violation of General Statutes § 53a-123 (a) (3),[11] and attempted larceny in the third degree in violation of General Statutes §§ 53a-49[12] and 53a-124.[13]

On July 12, 2000, the state gave notice to the defendant of its intention to seek the death penalty on the basis of the aggravating factors set forth in § 53a-46a (i) (1) and (6). The defendant subsequently filed a motion to dismiss the aggravating factors. In a thoughtful and comprehensive memorandum of decision, the

or (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person; or (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person; or (4) with intent to cause serious physical injury to another person and while aided by two or more other persons actually present, he causes such injury to such person or to a third person; or (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm. . . ."

[10] General Statutes § 53a-48 provides in relevant part: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . ."

[11] General Statutes § 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and . . . (3) the property, regardless of its nature or value, is taken from the person of another . . . ."

[12] General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . ."

[13] General Statutes § 53a-124 provides in relevant part: "(a) A person is guilty of larceny in the third degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property or service exceeds one thousand dollars . . . ."

trial court, *Lavine, J.*, denied the motion to dismiss as to § 53a-46a (i) (1), but granted the motion as to § 53a-46a (i) (6). Upon the granting of certification by the Chief Justice pursuant to General Statutes § 52-265a,[14] the state appealed to this court from the trial court's dismissal of the § 53a-46a (i) (6) aggravating factor.

On appeal, the state claims that the trial court improperly determined that § 53a-46a (i) (6) does not apply to a capital felony committed in the course of a robbery, but applies only to an offense involving a killing that is an essential prerequisite to the receipt of something of value, "including 'murders for hire' or contract killings, killings to obtain insurance proceeds, murders for inheritance, or murders in certain business contexts (e.g., the murder of a partner) which will, due to the operation of law, create pecuniary gain for the perpetrator." The state argues that robbery is committed "in expectation of the receipt" of pecuniary gain and, therefore, is covered by the statute. General Statutes § 53a-46a (i) (6). We agree with the trial court that § 53a-46a

[14] General Statutes § 52-265a provides: "(a) Notwithstanding the provisions of sections 52-264 and 52-265, any party to an action who is aggrieved by an order or decision of the Superior Court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the Supreme Court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

"(b) The Chief Justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice.

"(c) Upon certification by the Chief Justice that a substantial public interest is involved and that delay may work a substantial injustice, the trial judge shall immediately transmit a certificate of his decision, together with a proper finding of fact, to the Chief Justice, who shall thereupon call a special session of the Supreme Court for the purpose of an immediate hearing upon the appeal.

"(d) The Chief Justice may make orders to expedite such appeals, including orders specifying the manner in which the record on appeal may be prepared."

(i) (6) does not apply to a capital felony committed during the course of a robbery.[15]

The state's claim presents a question of statutory interpretation, over which our review is plenary. See *State* v. *Cobb*, 251 Conn. 285, 460, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). "A penal statute must be construed strictly against the state and liberally in favor of the accused." *State* v. *Torres*, 206 Conn. 346, 355, 538 A.2d 185 (1988). "Criminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . These considerations are especially pertinent to a death penalty statute . . . ." (Citations omitted.) *State* v. *McGann*, 199 Conn. 163, 177, 506 A.2d 109 (1986). "[T]he touchstone of this rule of lenity is statutory ambiguity. . . . [W]e . . . [reserve] lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." (Internal quotation marks omitted.) *State* v. *Jason B.*, 248 Conn. 543, 555, 729 A.2d 760, cert. denied, 528 U.S. 967, 120 S. Ct. 406, 145 L. Ed. 2d 316 (1999).

To provide context for our analysis of the state's claim, we briefly review the structure of our death penalty statutes as a whole. "In General Statutes §§ 53a-46a through 53a-46c, the legislature has established a three-tiered pyramid, in which each tier narrows the class of defendants that may be found eligible for the death penalty. At the first tier above the base of the pyramid, our statute separates capital felony homicides from other homicides, and authorizes bifurcated death penalty hearings only for those who have been found

---

[15] We express no opinion in this case, however, as to whether the statute applies to murders to obtain insurance proceeds or the like.

guilty of or have pleaded guilty to a capital felony. General Statutes § 53a-46a (b). At the second tier, the statute further limits the death penalty by requiring the sentencer to find, beyond a reasonable doubt, the existence of at least one statutorily delineated aggravating factor. General Statutes § 53a-46a (b), (e), (f), and (g). . . . At the third and final tier, our statute separates, from all cases in which a penalty of death may be imposed, those cases in which it shall be imposed . . . by requiring a sentencer to find, by a preponderance of the evidence, whether a mitigating factor exists. General Statutes § 53a-46a (e). In making this determination, the capital sentencer must consider the existence of each of the mitigating factors listed in the statute at § 53a-46a [h] and of any other mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime. General Statutes § 53a-46a [d]. If the sentencer fails to find the existence of a mitigating factor, after having found the existence of an aggravating factor, the court must sentence the defendant to death. General Statutes § 53a-46a (f)." (Citations omitted; internal quotation marks omitted.) *State* v. *Ross*, 230 Conn. 183, 236–38, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). In 1995, the legislature amended the death penalty statutes to provide that if the sentencer finds both a mitigating factor or factors and an aggravating factor or factors, the sentencer must determine whether "any aggravating factor or factors outweigh any mitigating factor or factors . . . ." Public Acts 1995, No. 95-19, § 1, codified in part as General Statutes § 53a-46a (e). If so, then "the court shall sentence the defendant to death." General Statutes § 53a-46a (f). If not, then "the court shall impose a sentence of life imprisonment without the possibility of release." General Statutes § 53a-46a (g).

## I

## THE LANGUAGE

We now turn to the merits of the state's claim. "As with any issue of statutory interpretation, our initial guide is the language of the statute itself." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 240 Conn. 317, 328, 692 A.2d 713 (1997). General Statutes § 53a-46a (i) provides in relevant part: "The aggravating factors to be considered shall be limited to the following . . . (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value . . . ." We do not conclude, as the state urges, that this language clearly and unambiguously applies to robbery.[16] The words "consideration," "receipt" and "expectation" invoke transactional concepts central to contract murder and invite the question whether the statute was intended to target capital felonies involving the taking of property by force. See footnote 2 of this opinion. Accordingly, to determine the intent of the legislature, we must examine the structure of the statute and the context of the language at issue, its legislative history and the case law of our sister states construing similar statutes.

## II

## CONSTRUCTION WITH GENERAL STATUTES § 53a-46a (i) (5)

As noted by the trial court, § 53a-46a (i) (5) provides significant context for the interpretation of § 53a-46a (i) (6). The (i) (5) factor applies to a defendant who procures the commission of a capital felony "by pay-

---

[16] Indeed, in one of the cases relied on by the state in support of its claim, the court included this statute in the category of jurisdictions that "explicitly provide that the aggravating circumstance is limited to the hired gun situation in no uncertain terms." *State* v. *McDonald*, 661 S.W.2d 497, 503 and n.8 (Mo. 1983), cert. denied, 471 U.S. 1009, 105 S. Ct. 1875, 85 L. Ed. 2d 168 (1985).

ment, or promise of payment, of anything of pecuniary value," whereas the (i) (6) factor applies to a defendant who commits a capital felony "as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value . . . ." The proximity and parallel structure of these two factors suggest that they were intended to apply respectively to the two parties to a murder for hire, and that it is the procurer's promise of payment, referred to in (i) (5), that gives rise to the expectation of receipt, referred to in (i) (6). See *Soares* v. *Max Services, Inc.*, 42 Conn. App. 147, 159, 679 A.2d 37, cert. denied, 239 Conn. 915, 682 A.2d 1005 (1996) (proximity of statutory provisions may reveal legislative intent).

The state claims, however, that this interpretation would render the clause "in expectation of the receipt" mere surplusage. It argues that, because "[a]n exchange of promises is sufficient consideration to support a contract"; *Osborne* v. *Locke Steel Chain Co.*, 153 Conn. 527, 531, 218 A.2d 526 (1966); a murder for hire is committed for "consideration" whether payment is actually made or merely promised prior to the commission of the offense. See 1 Restatement (Second), Contracts § 77 (1) (1981) ("[t]o constitute consideration, a *performance or a return promise* must be bargained for" [emphasis added]). Therefore, the state contends, the phrase "as consideration for the receipt" encompasses both actual receipt and expected receipt. Accordingly, it argues, if § 53a-46a (i) (6) is construed to apply only to murders for hire, that construction would render superfluous the second clause dealing with murders committed "in expectation of the receipt . . . of anything of pecuniary value . . . ."

We conclude that the state's interpretation rests on a faulty reading of the statute. As used in § 53a-46a (i) (6), the term "consideration" does not refer to the benefit for which the capital offense was committed, but to

the commission of the capital offense itself.[17] See General Statutes § 53a-46a (i) (6) ("the defendant committed the offense *as consideration for* the receipt" [emphasis added]). In other words, it is the intentional murder that serves as the consideration for receipt of payment. Therefore, the fact that, under contract law, the term "consideration" may mean either performance or the promise of performance is irrelevant to our construction of the statute. It does not follow from that legal principle that, for purposes of § 53a-46a (i) (6), the term "receipt" may mean either actual receipt or the expectation of receipt any more than it follows that, under § 53a-46a (i) (5), the term "payment" may mean either actual payment or the promise of payment. Accordingly, if § 53a-46a (i) (6) were construed to apply only to murders for hire, the second prong would not be superfluous because, unlike the first prong, it covers the situation where the defendant either received the promised pecuniary value after the capital felony was committed or never actually received it.

We emphasize that this statutory language was drafted with a view to prosecuting capital felonies, not to enforcing contracts. Accordingly, it is reasonable to infer that the legislature included the "expectation of the receipt" language in § 53a-46a (i) (6) to clarify that

---

[17] The court in *United States* v. *Walker*, 910 F. Sup. 837, 848 (N.D.N.Y. 1995), which is cited by the state in support of its claim, similarly misread an identically worded federal statute. See 21 U.S.C. 848 (n) (7). The court noted that "§ 848 (n) (7) has two prongs: that the offense was committed 'as consideration for the receipt' or 'in expectation of the receipt' of something of pecuniary value. Defendants' view seems correct that the first prong's use of the 'as consideration for' language of contract contemplates murder-for-hire. For this Court to transport that restriction to the second, 'in expectation of the receipt,' prong, however, would render the second clause mere surplusage." *United States* v. *Walker*, supra, 848. Although it is true that the "as consideration for" language of the first prong does not appear to qualify the second prong, it is also true that the "in expectation of" language of the second prong is not inherent in the first prong and, therefore, is not superfluous. General Statutes § 53a-46a (i) (6).

it did not intend to require the state to prove actual receipt of a promised payment in order to establish the aggravating factor.

## III

## DEFINITIONS OF "RECEIPT" AND "EXPECTATION"

The state also claims, however, that even if the second prong of § 53a-46a (i) (6), referring to the "expectation of the receipt," covers murders for hire that are not covered by the first prong, referring to "consideration for the receipt," the phrase "in expectation of the receipt" is not limited to cases in which the defendant has received a promise of payment, but includes any circumstance where the defendant expects to take possession of something of pecuniary value as a result of committing a capital offense. In support of its claim, the state relies primarily on the definition of the word "receipt." It points out that the court in *United States* v. *Walker*, 910 F. Sup. 837, 848 n.15 (N.D.N.Y. 1995),[18] in interpreting an identical aggravating factor and rejecting the interpretation of the statutory language urged by the defendant in this case, concluded that the term " 'receipt' " did not "serve to limit interpretation of the statute to pecuniary benefit which accrues to a defendant in a transactional sense . . . ." Rather, the court noted, " '[r]eceipt' in its plain and ordinary meaning is defined as '1a. An act of receiving something; b. The fact of being received.' Webster's II New Riverside Dictionary 981 (1994) 'Receive' is defined as '1. To

---

[18] The court in *United States* v. *Walker*, supra, 910 F. Sup. 837 was interpreting 21 U.S.C. § 848 (n) (7). Title 21 of the United States Code, § 848 (n) provides in relevant part: "If the defendant is found guilty of or pleads guilty to an offense under subsection (e) of this section, the following aggravating factors are the only aggravating factors that shall be considered, unless notice of additional aggravating factors is provided under subsection (h) (1) (B) of this section . . .

"(7) The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value. . . ."

acquire or *take* (something given, offered or transmitted): GET.' Id." (Emphasis in original.) *United States* v. *Walker*, supra, 848 n.15; see also id., 848, citing Webster's II New Riverside Dictionary (1994)[19] (concluding that "nothing in the plain and ordinary meaning of 'expectation' serves to limit an understanding of Congress' use of the term to murders in expectation of the receipt of an inheritance"). Accordingly, the court concluded that the statutory language was sufficiently broad to apply to robbery. *United States* v. *Walker*, supra, 848–49. The state in this case also cites Webster's New Universal Unabridged Dictionary (1996), which defines "to receive" as "to take into one's possession (something offered or delivered)," in support of its claim.

We disagree with the *Walker* court's analysis. In our view, neither the definition cited by that court nor the definition cited by the state in this case supports that court's broad interpretation of the statutory language. Both definitions are accompanied by parenthetical qualifiers that clearly connote the passive stance of a person who "receives." See Webster's II New Riverside Dictionary 981 (1994) (received item is "something given, offered or transmitted"); Webster's New Universal Unabridged Dictionary (1996) (received item is "something offered or delivered"). This connotation is at odds with the notion of robbery, which involves the use, or the threat of immediate use, of physical force upon a person to take property or to compel its delivery. See footnote 2 of this opinion. Similarly, the phrase "in expectation of" does not carry with it the connotation of purposive activity that the phrases "with intent to" or "in an attempt to" do, while it does connote both a sense of probability and of debt or obligation. See

---

[19] Webster's II New Riverside Dictionary (1994) defines "expect" as "1. to look forward to the probable occurrence or appearance of; 2. to consider likely or certain."

Webster's Ninth New Collegiate Dictionary (1991) ("expect" means "1 *archaic*: AWAIT 2: SUPPOSE, THINK 3: to anticipate or look forward to the coming or occurrence of <we ~ them any minute now> <~ed a telephone call> 4 a: to consider probable or certain <~ to be forgiven> <~ that things will improve> b: to consider reasonable, due, or necessary <~ed respect from the students> c: to consider bound in duty or obligated <they ~ you to pay your dues>"). The phrase "in expectation of the receipt," therefore, more accurately describes the mental state of a defendant who anticipates taking possession of something offered or to be delivered to him under a promise than that of a defendant who intends to take property from a person by force.

The state also claims that its interpretation is supported by General Statutes § 53a-118 (a) (6), which provides that, for purposes of part IX of chapter 952 of the Penal Code, relating to larceny, robbery and related offenses, "[t]o 'receive' means to acquire possession, control or title, or to lend on the security of the property." Although this definition appears, at first blush, to be broader than the dictionary definitions cited by the state, the state has pointed to no penal statute pertaining to larceny or robbery where the term "to receive" is actually used in the sense of "to rob." Rather, the statutes consistently distinguish those offenses in which the property is "received," i.e., is not taken by use of force directly from the person of the victim, from other theft offenses. See General Statutes § 53a-119 (8) and (13);[20] see also

[20] General Statutes § 53a-119 (8) provides: "A person is guilty of larceny by receiving stolen property if he receives, retains, or disposes of stolen property knowing that it has probably been stolen or believing that it has probably been stolen, unless the property is received, retained or disposed of with purpose to restore it to the owner. A person who accepts or receives the use or benefit of a public utility commodity which customarily passes through a meter, knowing such commodity (A) has been diverted therefrom, (B) has not been correctly registered or (C) has not been registered at all

General Statutes §§ 53a-128a (f),[21] 53a-128c,[22] and 53a-128g.[23]

Accordingly, we conclude that the dictionary and statutory definitions of "expectation" and "receipt" are

by a meter, is guilty of larceny by receiving stolen property."

General Statutes § 53a-119 (13) provides in relevant part: "(B) Any person, being in possession of personal property other than wearing apparel, received upon a written lease, who, with intent to defraud, sells, conveys, conceals or aids in concealing such property, or any part thereof, shall be prima facie presumed to have done so with the intention of converting such property to his own use. (C) A person who uses a false or fictitious name or address in obtaining such leased personal property shall be prima facie presumed to have obtained such leased personal property with the intent of converting the same to his own use or that of a third person. (D) 'Leased personal property', as used in this subdivision, means any personal property received pursuant to a written contract, by which one owning such property, the lessor, grants to another, the lessee, the right to possess, use and enjoy such personal property for a specified period of time for a specified sum."

[21] General Statutes § 53a-128a (f) provides: " 'Receives' or 'receiving' means acquiring possession, custody or control . . . ."

[22] General Statutes § 53a-128c provides in relevant part: "(a) Any person who takes a credit card from the person, possession, custody or control of another without the consent of the cardholder or of the issuer or who, with knowledge that it has been so taken, receives the credit card with intent to use it or to sell it, or to transfer it to any person other than the issuer or the cardholder is guilty of credit card theft and is subject to the penalties set forth in subsection (a) of section 53a-128i. Taking a credit card without consent includes obtaining it by conduct defined or known as statutory larceny, common law larceny by trespassory taking, common law larceny by trick, embezzlement, or obtaining property by false pretense, false promise or extortion.

"(b) Any person who receives a credit card that he knows to have been lost, mislaid, or delivered under a mistake as to the identity or address of the cardholder, and who retains possession, custody or control thereof with intent to use it or to sell it or to transfer it to any person other than the issuer or the cardholder, is guilty of credit card theft and is subject to the penalties set forth in subsection (a) of section 53a-128i. . . .

"(e) Any person, other than the issuer, who, during any twelve-month period, receives credit cards issued in the names of two or more persons which he has reason to know were taken or retained under circumstances which constitute credit card theft or a violation of section 53a-128b or subsection (c) or (d) of this section violates this subsection and is subject to the penalties set forth in subsection (b) of section 53a-128i. . . ."

[23] General Statutes § 53a-128g provides in relevant part: "Any person who receives money, goods, services or anything else of value obtained in viola-

consistent with the interpretation that the aggravating factor was not intended to apply to capital felonies committed in the course of a robbery.

IV

CONSTRUCTION WITH GENERAL STATUTES
§ 53a-46a (i) (1) AND (2)

The interpretation that § 53a-46a (i) (6) applies only to murders for hire is also consistent with subdivisions (1) and (2) of § 53a-46a (i), which provide: "The aggravating factors to be considered shall be limited to the following: (1) The defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony; or (2) the defendant committed the offense after having been convicted of two or more state offenses or two or more federal offenses or of one or more state offenses and one or more federal offenses for each of which a penalty of more than one year imprisonment may be imposed, which offenses were committed on different occasions and which involved the infliction of serious bodily injury upon another person . . . ." If we were to adopt the state's interpretation of § 53a-46a (i) (6), namely, that it applies to capital felonies committed with the expectation of pecuniary gain as the result of theft,[24] we would have to conclude that the legislature intended that, under § 53a-46a (i) (1), a capital felony would be aggra-

---

tion of section 53a-128d, knowing or believing the same to have been so obtained, violates this section and is subject to the penalties set forth in subsection (a) of section 53a-128i. . . ."

[24] The state conceded at oral argument before this court that the logical extension of its argument is that *all* offenses with a profit motive, including, among others, embezzlement, obtaining property by false pretenses and obtaining property by false promise; see General Statutes § 53a-119; each of which is inherently less violent than robbery, would be encompassed in § 53a-46a (i) (6).

vated only in cases in which there has been a prior conviction for the same felony or, under § 53a-46a (i) (2), in which there have been at least *two* previous convictions "involv[ing] the infliction of serious bodily injury," but that, under § 53a-46a (i) (6), the legislature intended that a capital felony involving theft would be aggravated regardless of whether there was a prior felony conviction for theft. For example, under § 53a-46a (i) (1), a defendant who committed murder during the course of an offense involving kidnapping and sexual assault in the first degree would be eligible for the death penalty[25] only if he previously had committed the offense of kidnapping or sexual assault—assuming that no other aggravating factors existed—while, under § 53a-46a (i) (6), a defendant who committed murder in the course of a kidnapping and robbery could receive the death penalty even if he had no previous convictions.

This result, however, which implies that the legislature considered offenses involving theft to be inherently more dangerous and heinous than other felonies, is inconsistent with the statute as a whole. If the legislature had considered theft to be more dangerous or heinous than kidnapping or sexual assault for purposes of constituting an aggravating factor, then, logically, the legislature would have made murder during the course of an offense involving theft a capital felony. The legislative history of the death penalty statute, however, shows that the legislature expressly chose not to do so.

---

[25] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety . . . (7) murder committed in the course of the commission of sexual assault in the first degree . . . ." Section 53a-54b has been amended to delete what had been subdivision (6); see Public Acts 2001, No. 01-151, § 3; with the result that subdivision (7) concerning murder committed in the course of the commission of sexual assault in the first degree has been redesignated subdivision (6).

During debate on the legislation ultimately enacted as Public Acts 1973, No. 73-137, § 3, now codified as General Statutes § 53a-54b, Representative Joseph M. Pugliese introduced House Amendment A, which would have made a capital felony of " 'murder committed by a person who was, at the time, committing robbery or burglary while armed.' " 16 H.R. Proc., Pt. 6, 1973 Sess., p. 2927. In support of the amendment, Representative Pugliese stated, "I offer this amendment as a deterrent hopefully that these people who do engage in these actions, although we perhaps cannot convince them not to rob, not to burglarize, that perhaps we cannot convice them that they should not carry a gun while doing these actions but perhaps if they know that they are going to get the death penalty for killing someone, we might just convince them that they ought to carry a gun that is not loaded." Id., p. 2928. Representative James F. Bingham opposed the amendment, however, stating that "[t]his bill was drafted very carefully to comply with the death penalty decision and if you read the specific crimes enunciated in the death penalty or calling for the capital felony, they fall into a category which has been defined by [*Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972)] as especially heinous and cruel crimes. . . . As to the far end of one scale we could say that the killing by a husband in a lover's quarrel would be probably the least heinous of crimes although many would say that is a heinous crime which should be paid for by the death penalty. On the other end of the scale, we have probably the most heinous crime known to man is the crime of the killing of a person for gain commonly known as the hit and if some person pays a thousand dollars to a hired killer, that, in my opinion, would be at the other end of the scale. . . . [I]t is my opinion and it is the opinion of the Attorney General's Office of the United States that the . . . inclusion of the crime enunciated

by Rep. Pugliese would render this bill unconstitutional." 16 H.R. Proc., supra, pp. 2928–29.

Representative Samuel S. Freedman also opposed the amendment, stating that "[f]irst of all, some of the language referring to at the time seems to me to be too vague to stand up in a criminal statute. Secondly, the singling out of one crime, such as this a crime of homicide and not including other crimes of homicide in similar situations, would lead us into equal protection problems under the Fourteenth Amendment." Id., pp. 2929–30. He also pointed out that Justice Blackmun, in his dissenting opinion in the *Furman* case, "continually refers to the most heinous crimes and I would give the House some examples of his language. He said in his dissent, if we were possessed of legislative power, I would restrict the use of capital punishment to a small category of the most heinous crimes. . . . [C]learly this bill is at present the most I believe we can expect to stand up constitutionally." Id., pp. 2930–31, remarks of Representative Freedman. In light of these objections, Representative Pugliese withdrew the proposed amendment. Id., p. 2932.

The legislature also had reservations about enacting a death penalty statute that would punish economic crimes and, therefore, have a disproportionate effect on the economically disadvantaged. Responding to such reservations, Senator George C. Guidera stated that "[i]t has been said by many Senators, opponents to the measure, that the sentence should be imposed without reference to economic or racial status. You know, murders committed by economically poor and the racial minority groups generally fall into one single category and that is burglary and a death, a shooting, which occurs after the burglary or the [larceny]. . . . [T]he mitigating and aggravating circumstances which we set up in this Bill do not in any place discriminate on the

basis of economic condition or racial group." 16 S. Proc., Pt. 4, 1973 Sess., pp. 1936–37.

This legislative history clearly indicates that the legislature did not consider robbery to be an especially heinous crime in the death penalty context, and that it concluded, for that reason, that the imposition of the death sentence for murders involving robbery would be of questionable fairness and constitutionality. With this background in mind, we have difficulty believing that the legislature contemplated that, on the one hand, a capital felony involving murder, kidnapping and rape, all of which, in and of themselves, the legislature considered to be particularly heinous and dangerous crimes, would not be sufficiently heinous to subject the defendant to the death penalty in the absence of an additional aggravating factor, but that, on the other hand, an offense involving murder, kidnapping and robbery would.

This legislative history also makes clear that the legislature considered murder for hire to be the single most heinous capital offense. See also id., p. 1868, remarks of Senator Guidera ("[t]he Bill also imposes the death penalty upon two classes of criminals who have no regard for human life and for whom personally I have no regard; [number] [o]ne: the hired assassin, the hired gunman, [number] [t]wo: the non-addict hard drug seller where the user of the drug dies as a result of its use"). This is consistent with the legislature's decision to make murder for hire both a capital felony and an aggravating factor so that, in combination with any other capital felony or aggravating factor, commission of that offense would subject the defendant to the possibility of receiving the death penalty.

Moreover, if the portion of the bill now codified as § 53a-46a (i) (6) was intended to cover offenses involving theft, it is difficult to understand why the opponents

of Amendment A, among whom was Representative Bingham, the principal sponsor of the death penalty bill in the House of Representatives and cochairman of the judiciary committee, neglected to mention that fact during debate on the amendment. Rather, if that were the case, it would have been natural for him and the other opponents of the amendment to point out that, even though a murder committed during the course of an armed robbery was not classified as a capital felony, robbery would be an aggravating factor if a murder otherwise was classified as a capital offense.

Finally, we find unpersuasive the state's suggestion that the *absence* in Connecticut's death penalty scheme of a separate aggravating factor explicitly referring to robbery supports its interpretation of § 53a-46a (i) (6). The state points out that, because Connecticut has not explicitly included robbery in a separate aggravating factor, it would not be " 'double counting' " to apply § 53a-46a (i) (6) to a killing in the course of a robbery. Cf. *State* v. *Chew,* 150 N.J. 30, 56, 695 A.2d 1301 (1997) (because New Jersey statute provides for aggravating factor where "offense was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit . . . robbery"; N.J. Stat. Ann. § 2C:11-3 c [4] [g] [West 1982]; court concluded that to apply aggravating factor identical to § 53a-46a [i] [6] to offense involving robbery would be "double-counting"); but see *State* v. *McDonald,* 661 S.W.2d 497, 505 (Mo. 1983), cert. denied, 471 U.S. 1009, 105 S. Ct. 1875, 85 L. Ed. 2d 168 (1985) ("the application of the receiving money [aggravating factor] to murder in the course of robbery would not be duplicative of an existing aggravating circumstance and is thus even more reasonable").[26] We cannot con-

[26] The court in *State* v. *McDonald,* supra, 661 S.W.2d 502–505, was construing § 565.012.2 (4) of the Missouri Revised Statutes (1978), which provides that an aggravating factor is found when the defendant committed capital murder "for the purpose of receiving money or any other thing of monetary value . . . ."

clude, however, that the legislature's choice not to classify robbery as an aggravating factor *explicitly*, as the Model Penal Code,[27] as well as several states,[28] have done, is affirmative evidence of its intent to do so *cryptically*. Rather, it is more logical to assume that the legislatures that have enacted aggravating factors both for offenses involving pecuniary gain and for those involving robbery have done so because they believed that the pecuniary gain factor did not apply to offenses committed in the course of a robbery. Accordingly, our legislature's choice is more logically interpreted as reflecting an intent to reject robbery as an aggravating factor than an intent to encompass it in § 53a-46a (i) (6). As stated by the trial court, "if the legislature had

[27] II A. L. I. Model Penal Code and Commentaries (1980) § 210.6 (3) (e), p. 109, provides in relevant part for an aggravating circumstance when "[t]he murder was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery . . . ."

[28] See Fla. Stat. c. 921.141 (5) (2001) ("[a]ggravating circumstances shall be limited to the following . . . (d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any . . . robbery"); Ill. Comp. Stat. Ann. 5/9-1 (b) (West 1993) ("[a] defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of first degree murder may be sentenced to death if . . . [6] the murdered individual was killed in the course of another felony if . . . [under certain circumstances] . . . [c] the other felony was one of the following: armed robbery"); Miss. Code Ann. § 99-19-101 (5) (2000) ("[a]ggravating circumstances shall be limited to the following . . . (d) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery"); N.J. Stat. Ann. § 2C:11-3 c (4) (g) (West 1995) (providing for aggravating factor where "[t]he offense was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit . . . robbery"); Ohio Rev. Code Ann. § 2929.04 (A) (7) (West 1997) ("[t]he offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit . . . aggravated robbery"); Texas Penal Code Ann. § 19.03 (a) (West 1994) ("[a] person commits [capital murder] if he commits murder as defined . . . and . . . intentionally commits the murder in the course of committing or attempting to commit . . . robbery").

wanted to turn killings accomplished during robberies, burglaries and larcenies into an [aggravating factor], it simply would have said so in a separate, unambiguous and straightforward [manner]."

V

ADDITIONAL LEGISLATIVE HISTORY

We next address the state's claim that other statements by legislators during the debate on the death penalty bill make it "unmistakably clear" that the legislature intended for § 53a-46a (i) (6) to apply to robbery. The state relies primarily on statements by Representative Bingham explaining that the state could establish an aggravating factor by proving that "the defendant committed the offense for the receipt or expectation of receipt of anything of pecun[iary] value"; 16 H.R. Proc., supra, p. 2925; and that "the crime was committed after procurement by hire or committed for hire or for some pecun[iary] value." Id., p. 2976. The state argues that this language does not expressly limit the aggravating factor to murders for hire. It further argues that, if Representative Bingham had understood the factor to be so limited, he would not have included the phrase "or for some pecuniary value" in his second remark.

Contrary to the state's claim, however, the remarks do not clearly and unambiguously indicate a legislative intent for the statute to apply to theft. The first remark cited by the state is a mere paraphrase of the statute, and the second remark, in and of itself, could be read as *equating* murder committed for some pecuniary value with murder for hire just as easily as it could be read to *distinguish* the two offenses.

The state also points to Senator Guidera's remark that "[t]he only crimes which have been designated as capital felonies are those in which there is a high degree of deterrence likely—the lifer who attempts to escape

from prison, the roof top sniper who fires on firemen in the performance of their duties, the bank robber or the liquor store holdup man who kills a policeman who attempts to foil his plans . . . ." 16 S. Proc., supra, p. 1868. The state argues that "the deterrent effect that Senator Guidera sought to achieve through the enactment of the bill would be realized only if the perpetrator of the crimes to be so deterred were eligible for the death penalty." We are not aware of, however, and the state has not pointed to, any theory under which the "lifer" or the "roof top sniper" referred to by Senator Guidera would be eligible for the death penalty in the absence of some additional aggravating factor. Id. Accordingly, we conclude that this remark was intended merely to explain the undisputed fact that all of the offenses referred to—murder committed by one who was, at the time of commission of the murder, under sentence of life imprisonment; General Statutes § 53a-54b (4); murder of a firefighter; General Statutes § 54a-54b (1); and murder of a police officer; General Statutes § 54a-54b (1)—are capital felonies.

The state also cites legislative history pertaining to the general purposes of the death penalty statutes in support of its argument. Specifically, it points to Senator Guidera's remark that "we're trying to protect, in this Bill, those individuals who are out on the street day in and day out who are trying to protect our lives and property including the policemen, the deputy sheriffs, the constables, the local police, the state police and so forth and so on . . . ." 16 S. Proc., supra, p. 1873. It also cites Senator John Zajac's remark that "by failing to execute a criminal convicted—a criminal convicted of these most awful offenses—we are failing to add the deterrent that might spare the indefinite number of innocent, human lives from prospective murderers." Id., p. 1880. Finally, it cites Senator Dave Odegard's statement that "government is fundamentally estab-

lished to protect the persons and property of its citizens. All of our human experience tells us that the certainty and severity of punishment is truly a deterrent to criminal acts." Id., p. 1927. The state argues that these remarks "clearly indicate that death penalty supporters believed that execution of criminals who commit the most heinous offenses is necessary for the capital felony statute to be an effective deterrent."

We have no quarrel with the state's understanding of the general purposes of the death penalty statutes to deter heinous offenses and to protect police officers acting within the scope of their duties. Nothing in these general remarks, however, definitively indicates that the legislature intended to deter "the most heinous offenses" and to protect police officers by making robbery an aggravating factor.

## VI

## OTHER JURISDICTIONS

The state also urges this court to follow two jurisdictions with aggravating factors identical to § 53a-46a (i) (6) that have construed the factor to apply to capital felonies committed during the course of a robbery. See *United States* v. *Walker*, supra, 910 F. Sup. 837 (construing 21 U.S.C. § 848 [n] [7]); *State* v. *Clark*, 126 Ariz. 428, 436, 616 P.2d 888, cert. denied, 449 U.S. 1067, 101 S. Ct. 796, 66 L. Ed. 2d 612 (1980) (construing Ariz. Rev. Stat. § 13-454 [E] [5] [1956]).[29] For the reasons set forth

---

[29] The state also cites *State* v. *McDonald*, supra, 661 S.W.2d 502–505 (construing Mo. Rev. Stat. § 565.012.2 [4] [1978], which provides for aggravating factor when defendant commits capital murder "for the purpose of receiving money or any other thing of monetary value," to apply to robbery), and *Pulliam* v. *State*, 236 Ga. 460, 466–67, 224 S.E.2d 8, cert. denied, 428 U.S. 911, 96 S. Ct 3225, 49 L. Ed. 2d 1219 (1976) (construing Ga. Code § 17-10-30 [b] [4] [Michie 1997], formerly § 27-2534.1 [b] [4], which provides for aggravating factor when "[t]he offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value," to apply to armed robbery). Because of the textual differences between the statutes under review in those cases and our statute, however, we find the cases to be of little guidance. Cf. *Ferguson* v. *State*,

in the foregoing analysis, however, we reject the conclusions of the court in *Walker* that (1) the defendant's interpretation of the factor would render the " 'in expectation of the receipt' " language superfluous; (2) the proximity and parallel structure of the aggravating factor for procurement of murder for hire was not significant; and (3) nothing else in the plain language or structure of the statute precluded the application of the statute to robbery. See *United States* v. *Walker*, supra, 848–49.

Nor are we persuaded by the Arizona court's conclusory statement that "[t]he circumstances surrounding the total episode reflect that the expectation of financial gain [from a robbery] was a cause of the murders," and that the factor was, therefore, applicable to robbery. *State* v. *Clark*, supra, 126 Ariz. 436. Moreover, that court subsequently held that "the language in [Ariz. Rev. Stat.] § 13-703 (F) (5) [1978] makes clear . . . that this aggravating [circumstance] does not apply in every situation where an individual has been killed while at the same time the defendant has made a financial gain. It is limited to those situations where the defendant committed the offense . . . *in the expectation* of the receipt of

642 A.2d 772 (Del. 1994) (construing Del. Code Ann. tit. 11, § 4209 [e] [1] [o] [1987], which provides for aggravating factor when "[t]he murder was committed for pecuniary gain," to apply to robbery); *State* v. *Rhines*, 548 N.W.2d 415, 449–50 (S.D.), cert. denied, 519 U.S. 1013, 117 S. Ct. 522, 136 L. Ed. 2d 410 (1996) (construing S.D. Codified Laws § 23A-27A-1 [3] [Michie 1988], which provides for aggravating factor when "[t]he defendant committed the offense for himself or another, for the purpose of receiving money or any other thing of monetary value," to apply to burglary); *State* v. *Young*, 853 P.2d 327, 367 (Utah 1993) (construing Utah Code Ann. § 76-5-202 [1] [f] [1987], which provides for aggravating factor where "[t]he homicide was committed for pecuniary or other personal gain," to apply to robbery); *Engberg* v. *State*, 686 P.2d 541, 551–52 (Wyo.), cert. denied, 469 U.S. 107, 105 S. Ct. 577, 83 L. Ed. 2d 516 (1984) (construing Wyo. Stat. Ann. § 6-4-102 [h] [vi] [Michie 1977], now § 6-2-102 [h] [vi], which provides for aggravating factor where "[t]he murder was committed for compensation, the collection of insurance benefits or other similar pecuniary gain," to apply to robbery).

anything of pecuniary value. . . . In other words, the hope of pecuniary gain must provide the impetus for the murder. For example, if a beneficiary killed an insured in order to gain the proceeds of a life insurance policy this aggravating circumstance would be satisfied. On the other hand, an unexpected or accidental death that was not in furtherance of the defendant's goal of pecuniary gain, which occurs during the course of or flight from a robbery, does not in itself provide a sufficient basis for finding the same aggravating circumstance." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Hensley*, 142 Ariz. 598, 603–604, 691 P.2d 689 (1984). Accordingly, it is far from clear that Arizona courts would apply the aggravating factor under the circumstances of this case. See also *United States* v. *Chanthadara*, 230 F.3d 1237, 1263–64 (10th Cir. 2000), cert. denied, 534 U.S. 992, 122 S. Ct. 457, 151 L. Ed. 2d 376 (2001) (noting that person who kills in course of robbery does not necessarily do so for pecuniary reasons and holding that, under 18 U.S.C. § 3592 [c] [8],[30] capital felony itself, rather than robbery, must be committed in expectation of pecuniary gain). Moreover, to the extent that *Hensley* and *Chanthadara* could be read as suggesting that the aggravating factor is applicable to certain capital offenses committed during the course of a robbery, namely, those in which the sole motive for the killing was pecuniary gain, for the reasons set forth in parts II, III and IV of this opinion, we are not convinced that the Connecticut legislature had any such intent.[31]

---

[30] Section 3592 (c) of title 18 of the United States Code provides: "Aggravating Factors for Homicide.—In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist . . .

"(8) Pecuniary gain.—The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value. . . ."

[31] We note that, as a practical matter, it would be extremely difficult to distinguish killings committed during the course of a robbery in order to

The defendant also points out that the court in *State v. Chew*, supra, 150 N.J. 56, construing an aggravating factor identical to § 53a-46a (i) (6), concluded that, to satisfy the factor, "it must be found that the killing is the essential prerequisite to the receipt of the gain, not just a killing that results in pecuniary gain."[32] The issue in that case, however, was whether the factor applied to a murder committed in order to obtain insurance proceeds, not whether it applied to robbery. Id., 50. Although the court stated in dicta that "our statute does not sustain the breadth of the factor adopted by the . . . court [in *United States v. Walker*, supra, 910 F. Sup. 837]"; *State v. Chew*, supra, 55; and "that it would be double-counting to apply the c (4) (d) factor to a killing in the course of a robbery;" id., 56; we conclude that, because the analysis in *Chew* focused on whether murder to obtain insurance proceeds, rather than murder in the course of a robbery, is covered by the aggravating factor, it adds little to the foregoing discussion.

---

avoid capture and prosecution from those committed in the expectation of pecuniary gain. A killing committed during the course of a robbery frequently is committed in order to facilitate escape or to avoid subsequent prosecution. No such difficulty arises if the aggravating factor is limited to murder for hire.

[32] Courts in other jurisdictions have similarly limited their pecuniary gain aggravating factors. See *State v. Rust*, 197 Neb. 528, 537–38, 250 N.W.2d 867, cert. denied, 434 U.S. 912, 98 S. Ct. 313, 54 L. Ed. 2d 198 (1977) (construing Neb. Rev. Stat. § 29-2523 [1] [c] [1975], which provides for aggravating factor when "[t]he murder was committed for hire, or for pecuniary gain, or the defendant hired another to commit the murder for the defendant," to apply "[1] to the hired gun, [2] to the hirers of the gun, and [3] to murder motivated primarily by a desire for pecuniary gain as in the case of a murder of an insured by the beneficiary of a life insurance policy for the purpose of obtaining the proceeds, or the murder of a testatory by a legatee or devisee to secure a legacy or a devise"); *Boutwell v. State*, 659 P.2d 322, 328 (Okla. Crim. App. 1983) (construing Okla. Stat. tit. 21, § 701.12 [3] [1981], which provides aggravating factor when "[t]he person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration," to be limited to murder for hire). Because of textual and structural differences between those statutes and our own, however, those cases are of little guidance in the present case.

## VII

## RULE OF LENITY

We recognize that, in a very broad sense, a defendant who commits a capital felony during the course of a robbery could be said, under certain circumstances, to have done so "in expectation of the receipt" of something of pecuniary value. General Statutes § 53a-46a (i) (6). As the trial court noted, however, "[t]he issue . . . is not whether the language of the statute *could* be [so] construed . . . but whether the legislature intended that it *would*." (Emphasis in original.) We conclude that the language, structure and legislative history of § 53a-46a (i) (6) all support the defendant's interpretation that the legislature had no such intention.

Even if we were to conclude, however, that it is simply uncertain whether § 53a-46a (i) (6) was intended to apply to a capital felony committed during the course of a robbery, when "a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute"; (internal quotation marks omitted) *State* v. *Jason B.*, supra, 248 Conn. 555; we apply the rule of lenity and resolve any ambiguity in favor of the defendant.

We conclude that § 53a-46a (i) (6) does not apply to a capital felony committed in the course of a robbery.

The judgment is affirmed.

In this opinion the other justices concurred.