## STATE OF CONNECTICUT *v.* SHELDON HIGGINS
### (SC 16403)

Sullivan, C. J., and Borden, Norcott, Katz and Vertefeuille, Js.

Argued January 14—officially released July 29, 2003

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Donna Mambrino*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The defendant, Sheldon Higgins, appeals[1] from the judgment of conviction, rendered after a jury trial, of capital felony in violation of General Statutes §§ 53a-54b (8)[2] and 53a-8,[3] two counts of assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1)[4] and 53a-8, and assault in the first

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony . . . ."

[2] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (8) murder of a person under sixteen years of age."

At the time that the defendant committed the offense, this statute was designated § 53a-54b (9). It was redesignated as § 53a-54b (8) in 2001 when the statute was amended for purposes not relevant to this appeal. See Public Acts 2001, No. 01-151. We refer in this opinion to the current revision of the statute.

[3] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[4] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

degree in violation of General Statutes §§ 53a-59 (a) (5)[5] and 53a-8. The defendant claims on appeal that: (1) the trial court improperly determined that § 53a-54b (8) does not require the state to establish that the defendant had the specific intent to kill a person known by him to be under the age of sixteen; (2) even if § 53a-54b (8) does not require the state to prove that the defendant knew the age of the victim, the defendant's conviction of capital felony was improper because the doctrine of transferred intent does not allow the state to charge a defendant with a more serious crime than the crime that he intended to commit; (3) if this court rejects the foregoing claims, it should exercise its supervisory authority to rule that the doctrine of transferred intent cannot be applied under the circumstances of this case; (4) § 53a-54b (8) is unconstitutional under the eighth and fourteenth amendments to the United States constitution[6] and article first, §§ 8 and 9, of the Connecticut constitution;[7] (5) § 53a-54b (8) is unconstitutional under the equal protection clauses of the state and federal constitutions;[8] (6) the conviction was legally inconsis-

[5] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[6] The eighth amendment to the United States constitution, which is made applicable to the states through the fourteenth amendment, provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

[7] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[8] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

Article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments, provides in relevant part: "No person shall be denied the equal protection of the law . . . ."

tent because the defendant could not simultaneously have had the three separate states of intent required by the various crimes of which he was convicted; and (7) the presence of uniformed correction officers in the courtroom during jury selection and trial deprived the defendant of a fair trial in violation of his due process rights and his right to a fair trial under the sixth amendment to the United States constitution.[9] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the afternoon of July 5, 1997, Corey Hite was standing outside the house owned by his aunt, Brenda Lawrence, at 65 Hartland Street, Hartford, when he saw a burgundy Nissan Pathfinder speeding on the street and endangering the children playing nearby. Hite stepped into the street, waved for the vehicle to stop and asked the driver, later identified as Dennis Smith, to drive more slowly. As he spoke to Smith, Hite placed his hands on the driver's side window of the vehicle, which was rolled down about four inches. Smith became angry and, without warning, sped off. As he drove away, the window broke.

Later that day, Smith told the defendant that the window had been broken during an attempted robbery.

---

[9] The sixth amendment to the United States constitution, which is made applicable to the states through the fourteenth amendment, provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."

With respect to the defendant's claims that § 53a-54b (8) imposes cruel and unusual punishment, that the statute violates principles of equal protection and that he was deprived of a fair trial, "[b]ecause the defendant has not briefed his claim[s] separately under the Connecticut constitution, we limit our review to the United States constitution. We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." (Internal quotation marks omitted.) *State* v. *Jones*, 65 Conn. App. 649, 652 n.6, 783 A.2d 511 (2001).

The defendant then drove Smith back to Hartland Street in the defendant's gold Acura Legend. Smith rode in the backseat of the car and carried a Colt semiautomatic rifle. At approximately 11:30 p.m., they arrived at Hartland Street. At that time, Hite was sitting in front of Brenda Lawrence's house with his seventeen year old brother, Marcus Hite, their cousins, O'Marie Lawrence and thirteen year old Tramell Maddox, and O'Marie Lawrence's girlfriend, seventeen year old Shani Richardson. Smith and the defendant drove slowly past the house, turned right onto Litchfield Street, immediately turned around and then turned left back onto Hartland Street. At that point, the defendant turned off the car's headlights. As the car passed Brenda Lawrence's house for the second time, Smith fired multiple gunshots at the group gathered in front of the house. The car then sped away. Police responding to the incident recovered eleven .223 caliber shell casings from the street and sidewalk near the shooting.

Maddox was killed by a gunshot wound to his pelvis that severed his right common iliac artery. Marcus Hite received a gunshot wound to his right arm that severed his brachial artery, injured a nerve and ultimately resulted in the permanent loss of the use of his right hand. Richardson received a gunshot wound to her right buttock that resulted in permanent disfigurement. O'Marie Lawrence received multiple small puncture wounds to his arm, fingers, hand and chest. Corey Hite was not wounded.

Shortly after the shooting, at approximately 11:45 p.m., the defendant drove his Acura to the house of Orrett Currie and his wife, Wanda Currie. He left the car in their garage. The next day, he called the Curries and asked them to wipe down the interior of the car. Later that day, Orrett Currie went to see the defendant at the house of the defendant's girlfriend. The defendant told him about the shooting at that time. Meanwhile,

Wanda Currie saw on the evening news on television that a child had been killed in a drive-by shooting on Hartland Street. The next morning, she told her husband that she wanted the defendant's car to be removed from their garage. Orrett Currie called the defendant, and they arranged for the car to be taken away by the defendant's brother.

During the next several days, Wanda Currie made a series of anonymous telephone calls to the Hartford police department and told them what she knew about the defendant's involvement in the shooting and the location of the defendant's car. Ultimately, she gave a written statement to the police. On the basis of the information provided by Wanda Currie, the police searched the defendant's apartment and found a Colt semiautomatic rifle loaded with .223 caliber ammunition hidden under a mattress. The gun was wrapped in a plastic bag on which Smith's fingerprints were found. Four of the cartridges in the rifle were designed to fragment after impact so as to maximize trauma to a victim. All eleven cartridge casings found at the scene of the shooting and a bullet fragment removed from Maddox's body had been fired by the gun found in the defendant's apartment.

In January, 1998, the Federal Bureau of Investigation's fugitive task force arrested the defendant in New York City. He was returned to Connecticut in June, 1998. After a jury trial, he was convicted of capital felony in connection with the murder of Maddox (count one), two counts of assault in the first degree in connection with the assaults on Marcus Hite and Richardson (counts two and three) and assault in the first degree in connection with the assault on O'Marie Lawrence (count four). The trial court imposed a sentence of life imprisonment without the possibility of release on the capital felony count; twenty years imprisonment on the count of assault on Marcus Hite, to be served consecu-

tively to the sentence on count one; ten years imprisonment on the count of assault on Richardson, to be served consecutively to the sentences on counts one and two; and five years imprisonment on the count of assault on O'Marie Lawrence, to be served consecutively to the sentences on counts one, two and three, for a total effective sentence of life imprisonment without the possibility of release to be followed by thirty-five years imprisonment. This appeal followed. Additional facts and procedural history will be set forth as required.

I

## THE CONVICTION OF CAPITAL FELONY UNDER THE DOCTRINE OF TRANSFERRED INTENT

The defendant claims that his conviction of capital felony under the doctrine of transferred intent was improper because he did not have the intent to kill a person known by him to be under the age of sixteen. This claim rests on two premises. First, he argues that § 53a-54b (8) contains an implied requirement that the state must prove that the defendant knew or reasonably should have known the age of the victim. Therefore, he argues, to permit the transfer of an intent to kill a person over the age of sixteen to the mistaken killing of a younger person would relieve the state of the burden of proving that element of the offense. Second, he argues that, even if knowledge of the victim's age is not an element of § 53a-54b (8), the doctrine of transferred intent may not be applied to impose a greater degree of liability than that which would have been imposed had the defendant committed the intended crime. The defendant also argues that, if this court rejects the foregoing claims, it should exercise its supervisory power to declare that the doctrine of transferred intent may not be applied under the circumstances of this case.

We conclude that § 53a-54b (8) contains no implied requirement that the defendant know the age of the victim. We further conclude that, under the circumstances of this case, the doctrine of transferred intent, as incorporated in General Statutes § 53a-54a,[10] allows the imposition of a greater degree of criminal liability than that imposed by the intended crime. Finally, we decline the defendant's invitation to exercise our supervisory power to pronounce on this question of substantive law.

A

We first consider whether § 53a-54b (8) contains an implied requirement that the defendant know the age of the victim. This claim involves a question of statutory interpretation, over which our review is plenary. See *State* v. *Sostre*, 261 Conn. 111, 120, 802 A.2d 754 (2002). "Whether [a culpable mental state] is or is not to be implied in the definition of a statutory crime, where it is not expressed, must be determined from the general scope of the [statute], and from the nature of the evils to be avoided." *State* v. *Gaetano*, 96 Conn. 306, 316, 114 A. 82 (1921); see also Commission to Revise the Criminal Statutes, Penal Code Comments, Connecticut General Statutes Annotated § 53a-5 (West 2001), commission comment.[11] "[T]he legislature may, if it so

[10] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[11] General Statutes § 53a-5 provides: "When the commission of an offense defined in this title, or some element of an offense, requires a particular mental state, such mental state is ordinarily designated in the statute defining the offense by use of the terms 'intentionally', 'knowingly', 'recklessly' or 'criminal negligence', or by use of terms, such as 'with intent to defraud' and 'knowing it to be false', describing a specific kind of intent or knowledge. When one and only one of such terms appears in a statute defining an offense, it is presumed to apply to every element of the offense unless an intent to limit its application clearly appears."

The commission comment to § 53a-5 provides in relevant part that the statute "does not . . . change the prior case law that omission of language of mental culpability is not conclusive, and whether a mental state is required

chooses, ignore the common-law concept that criminal acts require the coupling of the evil-meaning mind with the evil-doing hand and may define crimes which depend on no mental element, but consist only of forbidden acts or omissions." (Internal quotation marks omitted.) *State* v. *Kreminski*, 178 Conn. 145, 149, 422 A.2d 294 (1979). "[P]ublic policy may require that in the prohibition or punishment of particular acts it may be provided that he who shall do them shall do them at his peril, and will not be heard to plead in defense good faith or ignorance." (Internal quotation marks omitted.) Id., 150–51.

We begin our analysis with the language of the relevant statutes. Section 53a-54b (8) provides that a person is guilty of capital felony when he is convicted of "murder of a person under sixteen years of age." General Statutes § 53a-54a (a) provides in relevant part that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ." Read together, the plain language of these statutes indicates that, to be convicted under § 53a-54b (8), the defendant must have the intent to cause the death of another person and, acting with that intent, must cause the death of a person under the age of sixteen. Cf. *State* v. *Phu Dinh Le*, 17 Conn. App. 339, 343, 552 A.2d 448 (1989) (read together, plain language of General Statutes § 53a-95, defining crime of unlawful restraint in first degree, and General Statutes § 53a-91 [1], defining "restrain," requires state to prove that defendant intentionally restrained victim). The capital felony statute does not

is a question of statutory construction, depending on the general scope of the act and the nature of the evils to be avoided." Commission to Revise the Criminal Statutes, Penal Code Comments, supra, § 53a-5, commission comment. "While the commission comment hardly has the force of enacted law, it, nevertheless, may furnish guidance." *Valeriano* v. *Bronson*, 209 Conn. 75, 94, 546 A.2d 1380 (1988).

contain any specific language requiring the state to prove that the defendant knew the age of the victim.

The defendant points out, however, that, under General Statutes § 53a-5, "[w]hen one and only one of such terms appears in a statute defining an offense, it is presumed to apply to every element of the offense unless an intent to limit its application clearly appears." Accordingly, he argues that, because § 53a-54b (8) requires that the defendant have an intent to kill, it must also require that the defendant have an intent to kill a person known by the defendant to be under the age of sixteen. We disagree. This court previously has recognized that, when a statute requires the state to prove that the defendant *intentionally engaged* in the statutorily proscribed *conduct*, § 53a-5 does not require us to presume that the statute requires the state to prove that the defendant *had knowledge* of a *circumstance* described in the statute. See *State* v. *Denby*, 235 Conn. 477, 668 A.2d 682 (1995). In *Denby*, this court considered whether General Statutes (Rev. to 1991) § 21a-278a (b), which provides in relevant part that, "[t]o constitute a violation of this subsection, an act of transporting or possessing a controlled substance shall be with intent to sell or dispense in or on, or within one thousand feet of, the real property comprising a public or private elementary or secondary school," required the state to prove that the defendant knew that the location of the sale was within 1000 feet of a school. We concluded that the statute "specifically requires a mental state of 'intent,' which must be applied to every element of that statute. The mental state of knowledge that the location is within the 1000 foot zone is not set forth in § 21a-278a (b). An 'intent' element is not synonymous with a 'knowledge' element, each of which is specifically defined in the penal code.[12] The absence of any statutory

[12] General Statutes § 53a-3 (11) provides: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage

requirement that the defendant knowingly sell within the prohibited school zone demonstrates that the legislature did not intend to make knowledge an element of the crime. If the legislature had wanted to make knowledge as to location of a school an element of the offense, it would have done so by specifically stating that the defendant possessed the narcotics with the intent to sell or dispense at a location that the defendant knew was in, or on, or within 1000 feet of a school."[13] *State* v. *Denby*, supra, 482–83. *Denby* makes clear, therefore, that § 53a-5 does not compel the interpretation of § 53a-54b (8) urged by the defendant.

We also recognize, however, that we are not precluded from finding a requirement for mental culpability when a statute contains none. See Commission to Revise the Criminal Statutes, Penal Code Comments, supra, § 53a-5, commission comment (omission of language of mental culpability in penal statute is not conclusive). Rather, as we already have indicated, whether a particular mental state is required for a specific element of an offense in the absence of an explicit provision depends on the "general scope of the [statute]

in such conduct . . . ."

General Statutes § 53a-3 (12) provides: "A person acts 'knowingly' with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists . . . ."

[13] See also *State* v. *Newton*, 59 Conn. App. 507, 517, 757 A.2d 1140 (General Statutes § 53a-111 [a] [2] does not contain implied requirement that defendant intended to injure firefighters), cert. denied, 254 Conn. 936, 761 A.2d 764 (2000); *State* v. *Swain*, 245 Conn. 442, 462–63, 718 A.2d 1 (1998) (General Statutes § 14-215 [a] does not contain implied requirement that defendant knew of driver's license suspension); *State* v. *Plude*, 30 Conn. App. 527, 540–41, 621 A.2d 1342 (General Statutes § 53a-71 [a] [1] does not contain implied requirement that defendant knew age of victim), cert. denied, 225 Conn. 923, 625 A.2d 824 (1993); *State* v. *Tucker*, 9 Conn. App. 161, 168, 517 A.2d 640 (1986) (General Statutes § 53a-60 does not contain implied requirement that defendant intended to cause injury with dangerous instrument or deadly weapon).

and the nature of the evils to be avoided." Id.; *State* v. *Gaetano,* supra, 96 Conn. 316.

The defendant argues that the purpose of § 53a-54b (8) is to deter the murder of persons under the age of sixteen and, therefore, knowledge of the victim's age must be a required element of the crime because the murder of a child cannot be deterred if the actor is not aware of the victim's age. The state argues, to the contrary, that the statute's primary purpose of protecting children[14] would be advanced more effectively by holding a defendant liable for the murder of a child even when the defendant did not know the victim's age. For example, the state argues, its interpretation of the statute would more effectively deter drive-by shootings, like the one in the present case, where the defendant, intending to kill another person, shoots a firearm haphazardly into a crowd of people whose identities and ages he does not know. We agree with the state. As the state argued in its brief, the legislature undoubtedly "intended to include in the protected class [fourteen and fifteen year] olds as well as very young children, and intended to include teenagers who were unknown to the defendant as well as those teenagers whose [birth dates] a defendant would be expected to know." To limit the applicability of § 53a-54b (8) to cases in which

[14] In support of this contention, the state cites 38 S. Proc., Pt. 3, 1995 Sess., pp. 854, 861, remarks of Senator Thomas F. Upson (bill ultimately enacted as § 53a-54b [8] protects "most defenseless of our citizens" and "most vulnerable"); id., p. 855, remarks of Senator John A. Kissel (children are "worthy of utmost protection"); 38 H.R. Proc., Pt. 3, 1995 Sess., p. 1099, remarks of Representative Ronald S. San Angelo ("this amendment is protecting the most vulnerable part of our society, our children"); 38 H.R. Proc., supra, p. 1100, remarks of Representative San Angelo ("we must do whatever we can as a General Assembly to protect those children, to see to it that they aren't murdered"); 38 H.R. Proc., supra, p. 1105, remarks of Representative San Angelo ("It is an issue of protecting people in our society that are more vulnerable than other people . . . . Truly, people who cannot defend themselves deserve a little added protection by the State of Connecticut.").

the state can prove that the defendant knew or reasonably should have known the age of his victim would be both impracticable and inconsistent with this legislative intent. Accordingly, we conclude that knowledge of the victim's age is not an element of § 53a-54b (8).[15] Cf. *United States* v. *Feola*, 420 U.S. 671, 684, 95 S. Ct. 1255, 43 L. Ed. 2d 541 (1975) ("to effectuate the congressional purpose of according maximum protection to federal officers . . . [federal statute] cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer").

"This interpretation poses no risk of unfairness to [the defendant]. It is no snare for the unsuspecting. Although the [defendant] . . . may be surprised to find that his intended victim [is under the age of sixteen], he nonetheless knows from the very outset that his planned course of conduct is wrongful. The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the [victim]. In a case of this kind the offender takes his victim as he finds him." Id., 685. If a defendant intentionally murders an innocent person without knowing that person's age, he does so "at his peril, and will not be heard to plead in defense good faith or ignorance." (Internal quotation marks omitted.) *State* v. *Kreminski*, supra, 178 Conn. 151.

## B

We next address the defendant's argument that, even if § 53a-54b (8) does not require the state to prove

---

[15] We note that several of our sister states similarly have interpreted their capital felony statutes targeting the murder of persons under a specific age. See *State* v. *Phillips*, CR-01-1385, 2002 WL 844398, *4 (Ala. Crim. App., May 3, 2002) (statute providing that murder of person under age of fourteen is capital offense does not have implied requirement that defendant intended to kill and knew age of victim); *Black* v. *State*, 26 S.W.3d 895, 899 (Tex. Crim. App. 2000) (statute providing that murder of child under age of six is capital felony does not have implied requirement that defendant intended to kill and knew age of victim).

knowledge that the victim was under the age of sixteen, his conviction under that statute was improper because the doctrine of transferred intent does not allow the imposition of a greater degree of liability than that which would be imposed if the defendant had committed the intended crime.[16] We disagree.

The intentional murder statute, § 53a-54a (a), provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person *or of a third person.* . . ." (Emphasis added.) Thus, the statute "specifically provide[s] for intent to be transferred from the target of the defendant's conduct to an unintended victim." *State* v. *Hinton,* 227 Conn. 301, 316, 630 A.2d 593 (1993). Indeed, the defendant in the present case does not dispute that the evidence was sufficient to support a conviction of murder under § 53a-54a. In our recent decision in *State* v. *Coltherst,* 263 Conn. 478, 500–502, 820 A.2d 1024 (2003), we concluded that a conviction under § 53a-54a (a) is sufficient to meet the requirement

---

[16] The state argues that this claim is unpreserved, but concedes that it is reviewable under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding,* "a defendant can prevail on [an unpreserved] claim of constitutional error . . . only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) Id., 239–40. We agree that the record is adequate for review and that the claim is of constitutional magnitude. See *State* v. *Hinton,* 227 Conn. 301, 308, 630 A.2d 593 (1993) ("[b]ecause the defendant's claim concerns intent, which is an essential element of the crime of murder, he has satisfied *Golding*'s second prong"). Accordingly, we need not decide whether this claim was preserved. Although the claim is reviewable, it fails under the third prong of *Golding* because we conclude that the doctrine of transferred intent constitutionally may be applied under the circumstances of this case.

of an intentional murder conviction under the capital felony statute, regardless of the defendant's subjective state of mind.[17] We have concluded in part I A of this opinion that § 53a-54b (8) contains no additional intent requirement beyond that required for a conviction under § 53a-54a (a). Accordingly, read together, § 53a-54a (a) and § 53a-54b (8) provide that a conviction of intentional murder under the doctrine of transferred intent may be the predicate for a conviction of capital felony under § 53a-54b (8) when the victim is under the age of sixteen, regardless of the defendant's subjective state of mind.[18]

---

[17] In *Coltherst*, we considered the defendant's claim that, under *State* v. *Harrell*, 238 Conn. 828, 839, 681 A.2d 944 (1996), and *State* v. *Johnson*, 241 Conn. 702, 713–14, 699 A.2d 57 (1997), he could not be convicted of capital felony under § 53a-54b (5) because his murder conviction was premised on the doctrine set forth in *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). He argued that, although he had been convicted of intentional murder under § 53a-54a, because the intent to kill had been imputed to him under *Pinkerton*, he had not committed an intentional murder for purposes of the capital felony statute. *State* v. *Coltherst*, supra, 263 Conn. 500–502. In *Harrell*, we "determined as a matter of statutory interpretation that the word 'murder' as used in § 53a-54b means intentional murder as defined by Public Acts 1973, No. 73-137, § 2, now codified as § 53a-54a (a). Therefore, we concluded in *Harrell* that the defendant's conviction for arson murder in violation of § 53a-54d could not serve as a predicate murder for purposes of the capital felony statute." *State* v. *Coltherst*, supra, 500, citing *State* v. *Harrell*, supra, 839. Similarly, in *Johnson*, we rejected the state's claim that the defendant's conviction of felony murder could serve as the predicate for capital felony when the defendant's codefendant had an intent to kill, concluding that the "requirement [under § 53a-54b] of an intentional murder refers to the underlying murder that the defendant was *convicted of* . . . ." (Emphasis in original.) *State* v. *Johnson*, supra, 712. In *Coltherst*, we determined that, in *Harrell* and *Johnson*, we had not focused on the defendant's subjective state of mind in concluding that a defendant could not be charged under § 53a-54b unless he had been convicted of intentional murder. *State* v. *Coltherst*, supra, 500–501. Instead, those cases stand for the proposition that a conviction under § 53a-54a is both necessary and sufficient to meet the requirement of a murder conviction under the capital felony statute, regardless of the defendant's subjective state of mind. Id. Accordingly, we rejected the defendant's claim.

[18] We do not address the defendant's claim that, "by imposing liability under the capital felony statute in this case, the transferred intent language in the murder statute has been rendered superfluous" because we do not

The defendant argues, however, that the incorporation of the doctrine of transferred intent in the intentional murder statute does not unambiguously establish that he may be found guilty of the more serious offense of capital felony when the predicate murder was the killing of an unintended victim under the age of sixteen because neither § 53a-54a (a) nor § 53a-54b (8) expressly abrogates what he claims to be a common-law limitation on that doctrine, i.e., that a defendant cannot be convicted, under the doctrine of transferred intent, of a more serious offense than the offense he intended to commit. See *Vitanza* v. *Upjohn Co.*, 257 Conn. 365, 381, 778 A.2d 829 (2001) (statute presumed not to abrogate common-law rule in absence of clear legislative expression to contrary). We do not agree, that the common law contains any such limitation on the doctrine of transferred intent.

"[T]he principle of 'transferred intent' was created to apply to the situation of an accused who intended to kill a certain person and by mistake killed another. His intent is transposed from the person to whom it was directed to the person actually killed." *State* v. *Hinton*, supra, 227 Conn. 306 n.8; see also 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.12 (d), p. 399 ("[i]n the unintended-victim [or bad-aim] situation—where A aims at B but misses, hitting C—it is the view of the criminal law that A is just as guilty as if his aim had been accurate"). "Under the common-law doctrine of transferred intent, a defendant, who intends to kill one person but instead kills a bystander, is deemed the author of whatever kind of homicide would have been committed had he killed the intended vic-

understand it. The defendant's murder conviction, which was the predicate for his capital felony conviction, was premised on the transferred intent provision of § 53a-54a (a).

tim."[19] 2 F. Wharton, Criminal Law (15th Ed. Torcia 1994) § 146, pp. 291–93; see also 40 Am. Jur. 2d 461, Homicide § 11 (1999) (killing of unintended victim "partakes of the quality of the original act, so that the guilt of the perpetrator of the crime is exactly what it would have been had the blow fallen upon the intended victim instead of the bystander").

The defendant argues that these formulations establish that a defendant cannot be convicted under the doctrine of transferred intent of a more serious offense than the offense of which he would have been convicted had he killed his intended victim. This court previously has not prescribed such a limitation. Moreover, scholarly opinion is unsettled on whether "the transferred-intent theory will be applied even when the result is a greater degree of criminal liability than if the intended victim had been hit, as where . . . the law makes harm to [an unintended victim] a more serious offense than harm to [the intended victim]." 1 W. LaFave & A. Scott, Substantive Criminal Law (Sup. 2003) § 3.12, p. 76. The LaFave and Scott treatise indicates that such "may be" the case, and cites two interpretations of the Model

---

[19] Scholars have struggled, more or less unsuccessfully, to articulate a coherent rationale for this doctrine. See 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.12 (d), p. 400 (discussing deficiencies in various rationales for doctrine); P. Robinson, "Imputed Criminal Liability," 93 Yale L.J. 609, 619–20 (1984) ("while there may be a community consensus that an element should be imputed because the actor is as culpable as if he had in fact satisfied the element, there is no analytic theory to support the consensus"); D. Karp, note, "Causation in the Model Penal Code," 78 Colum. L. Rev. 1249, 1267–72 (1978) (discussing various rationales for doctrine and concluding that "none seems adequate"); W. Prosser, "Transferred Intent," 45 Tex. L. Rev. 650, 661 (1966-1967) (comparing old rationale of "absolute wrong" with modern "doctrine of 'foreseeable consequences,' which is itself . . . vague and undefined"); G. Williams, Criminal Law: The General Part (2d Ed. 1961) pp. 134–37 (referring to doctrine as "rather an arbitrary exception to normal principles" and discussing deficiencies in attempts to justify it).

Penal Code's transferred intent provision, § 2.03 (2),[20] addressing this question. Id., p. 76 n.46.1, citing P. Robinson, "Imputed Criminal Liability," 93 Yale L.J. 609, 649 n.151 (1984), and D. Karp, note, "Causation in the Model Penal Code," 78 Colum. L. Rev. 1249, 1272 (1978).

Robinson's article states that "the defendant may shoot at and miss a civilian victim, but hit an on-duty police officer. A provision similar to § 2.03 (2) (a) would impose liability for the more serious harm, injury of an officer (if the jurisdiction distinguishes between injury to an officer and injury to a private individual)." P. Robinson, supra, 93 Yale L.J. 649 n.151. The article also states that "the best explanation of why the intent to shoot the desired victim should be 'transferred' to the actual victim is that both intentions are equally culpable. The theory is merely one of equivalence." Id., 620. "The rationale for imputing the absent state of mind is simply that the actor had the intention (or other level of culpability) to commit another offense, and is therefore as culpable, and can properly be treated, as if he had the required intention for the offense committed." Id. Thus, in Robinson's view, the doctrine of transferred intent requires broad equivalence between the defen-

---

[20] 1 A.L.I., Model Penal Code and Commentaries (1985) § 2.03 provides in relevant part: "(2) When purposely or knowingly causing a particular result is an element of an offense, the element is not established if the actual result is not within the purpose or the contemplation of the actor unless:

"(a) the actual result differs from that designed or contemplated, as the case may be, only in the respect that a different person or different property is injured or affected or that the injury or harm designed or contemplated would have been more serious or more extensive than that caused; or

"(b) the actual result involves the same kind of injury or harm as that designed or contemplated and is not too remote or accidental in its occurrence to have a [just] bearing on the actor's liability or on the gravity of his offense."

Although Connecticut has no transferred intent statute analogous to the Model Penal Code's, the scholarly commentary on the Model Penal Code's provision serves as a convenient point of departure for a discussion of the common-law doctrine.

dant's actual state of mind and that attributed to him. See also id., 648 (§ 2.03 of Model Penal Code [ see footnote 20 of this opinion] "attempts to assure a general equivalence between defendant's actual culpability and that imputed to him"). The doctrine, at least as it is incorporated in the Model Penal Code, does not demand equivalence between the contemplated and actual offenses. See id., 649 (§ 2.03 of Model Penal Code does not adjust defendant's ultimate liability when contemplated and actual offenses are not equivalent).

Karp's note, on the other hand, focuses on Model Penal Code § 2.03 (2) (b) and concludes that the term "kind" could be read "as referring to 'legal kinds,' i.e., classes of harm that give rise to the same offense. So understood, the [Model Penal Code's] 'same kind' requirement would be adequately clarified by replacing the wording 'same kind of injury or harm' with an express requirement that the actual harm give rise to the *same offense* as the harm designed, contemplated, or risked." (Emphasis added.) D. Karp, supra, 78 Colum. L. Rev. 1272–73.[21]

In support of this position, Karp's note states that the application of the doctrine of transferred intent "when the harm to the actual victim gives rise to a different offense from the harm intended to the intended victim" has been barred at common law. Id., 1272 n.70, citing G. Williams, Criminal Law: The General Part (2d Ed. 1961) pp. 128–29. Williams' treatise states

---

[21] We note, however, that, if the words "same kind" in § 2.03 (2) (b) of the Model Penal Code are understood as referring to the nature of the injury to the victim as compared with the intended injury, and not to "legal kinds," i.e., specific offenses, then that provision would be consistent with Robinson's reading of § 2.03 (2) (a). See, e.g., *State* v. *Cantua-Ramirez*, 149 Ariz. 377, 380, 718 P.2d 1030 (App. 1986) (construing Arizona statute similar to Model Penal Code § 2.03 and concluding that, under statutory analogs to both subsections [2] [a] and [2] [b], doctrine of transferred intent is applicable if "the harm which occurred was not more extensive than the harm intended, it merely imposed a greater penalty").

that the doctrine of transferred intent "applies only where the harm that follows is of the same legal kind as that intended. In other words, malice is transferred only within the limits of the same crime. . . . Thus an intent to steal cannot make a man guilty of damage caused in a consequential but unintended fire; and an intent to commit malicious damage by fire to chattels cannot support a conviction for arson if the fire unintentionally spreads to the house." G. Williams, supra, pp. 128–29. As a further example, the treatise poses the following hypothetical situation: "Suppose that the accused has set fire to a dock building in circumstances constituting an offence under [a particular statute] (which makes the act a felony punishable with imprisonment for fourteen years), and suppose that the fire then spreads to a ship. If the accused is indicted for maliciously setting fire to a ship under [another section of the statute] (which would make him liable upon conviction to a sentence of imprisonment for life), the malice cannot be transferred from the building to the ship, though both are the subject of what may be called statutory arson." Id., p. 131.

The treatise explains that "[t]he reason for the restriction is that otherwise too great violence would be done to the doctrine of mens rea and to the wording of the statute under which the charge is made. The accused can be convicted where he both has the mens rea and commits the actus reus specified in the rule of law creating the crime, though they exist in respect of different objects. He cannot be convicted if his mens rea relates to one crime and his actus reus to a different crime, because that would be to disregard the requirement of an appropriate mens rea." Id., p. 129; see also J. Smith & B. Hogan, Criminal Law (5th Ed. 1983) p. 63 (under English common law, doctrine "operates only when the actus reus and the mens rea of the same crime coincide").

Upon a careful reading of Williams' treatise, we conclude that it does not suggest the existence of a categorical bar to the application of the doctrine of transferred intent under the common law when the offense with which the defendant is charged is different from, and carries a more severe penalty than, the offense intended by the defendant. Instead, the treatise indicates that the common law recognizes a bar to the application of the doctrine only when the mens rea requirements of the two offenses are different. Thus, where a statutory offense requires proof of specific intent to set fire to a ship, intent to set fire to a dock cannot satisfy that element. Williams' treatise does not suggest, however, that, if a statute prohibited the intentional destruction of property by fire, and another statute increased the penalty for such destruction where the property destroyed was a ship, but did not require proof of specific intent to destroy a ship, the application of the doctrine would be barred in a case where the defendant intentionally set fire to a dock and accidentally destroyed a ship. This is consistent with Robinson's view that the doctrine of transferred intent, at least as it is embodied in the Model Penal Code, requires only broad equivalence between the defendant's actual state of mind and that attributed to him, not technical equivalence between the offense contemplated and the offense with which the defendant was charged.

The ambiguity as to whether this limitation on the doctrine of transferred intent, i.e., that it may be applied "only within the limits of the same crime"; G. Williams, supra, p. 128; requires, on the one hand, only equivalence of culpability and conduct between the specifically intended offense and the charged offense, or, on the other hand, must be understood as limiting prosecutions to the same statutory offense as that with which the defendant would have been charged if he had committed the specifically intended harm, is reflected in

the decisions of courts in other jurisdictions. Several courts, consistent with Robinson's view, have concluded that a defendant may be convicted under the doctrine of transferred intent of a more serious offense than that of which he would have been convicted had he committed the intended harm. See *State* v. *Phillips*, CR-01-1385, 2002 WL 844398 (Ala. Crim. App., May 3, 2002); *State* v. *Cantua-Ramirez*, 149 Ariz. 377, 380, 718 P.2d 1030 (App. 1986) (construing Arizona transferred intent statute that is similar to Model Penal Code[22] and concluding that, because liability may be imposed when "the harm which occurred was not more extensive than the harm intended, it merely imposed a greater penalty," defendant who intended to strike adult but struck baby may be convicted of more serious offense of striking child); see also *Palafox* v. *State*, 949 S.W.2d 48, 49 (Tex. App. 1997) (construing Texas transferred intent statute[23] and concluding that "[w]hen the only difference between what the actor desired or intended and the

---

[22] The statute at issue in *Cantua-Ramirez*, Ariz. Rev. Stat. Ann. § 13-203 (B) (West 2001), provides: "If intentionally causing a particular result is an element of an offense, and the actual result is not within the intention or contemplation of the person, that element is established if:

"1. The actual result differs from that intended or contemplated only in the respect that a different person or different property is injured or affected or that the injury or harm intended or contemplated would have been more serious or extensive than that caused . . .

"2. The actual result involves similar injury or harm as that intended or contemplated and occurs in a manner which the person knows or should know is rendered substantially more probable by such person's conduct." See *State* v. *Cantua-Ramirez*, supra, 149 Ariz. 379.

[23] Texas Penal Code Ann. § 6.04 (Vernon 2003) provides: "(a) A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

"(b) A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that:

"(1) a different offense was committed; or

"(2) a different person or property was injured, harmed, or otherwise affected."

actual result is that a different offense was committed, the actor is responsible for causing the result that actually occurs").[24] The facts in *State v. Phillips*, supra, 2002 WL 844398, are remarkably similar to those in the present case. In *Phillips*, the defendants had shot at several police officers while the officers were sitting in their cars. The officers were injured, but not killed. One of the bullets, however, struck and killed a six year old boy who had been standing inside an enclosed porch. Under Alabama law, it was a capital offense both (1) to murder a person under the age of fourteen and (2) to murder a person by use of a deadly weapon fired from outside a dwelling while the victim is inside the dwelling. Id., *4. The defendants were charged under both provisions. The Alabama Court of Criminal Appeals held that the charges were proper under the doctrine of transferred intent, even though the defendants had not intended to kill a person in either protected class. Id. At least one court, however, has concluded that, for the doctrine to apply, the offense charged and the offense contemplated must be the same. See *United States v. Montoya*, 739 F.2d 1437 (9th Cir. 1984) (defendant who intended to strike civilian but struck federal officer could not be convicted under common-law doctrine of transferred intent of more serious offense of assault on federal officer).

---

[24] Cf. *B.L.L. v. State*, 764 So. 2d 837 (Fla. App. 2000) (where statute enhancing severity of crime of battery when victim is school employee required knowledge that victim is school employee, defendant who intended to hit student but hit school employee could not be convicted of more serious offense); *Mordica v. State*, 618 So. 2d 301 (Fla. App. 1993) (where statute enhancing severity of crime of battery when victim is police officer required knowledge that victim is police officer, defendant who intended to hit fellow inmate and hit police officer could not be convicted of more serious offense). In these cases, the doctrine of transferred intent could not be applied because each of the statutes under which the respective defendants was charged contained a mental requirement, i.e., knowledge of the victim's status, that the defendants did not actually possess.

We are persuaded that, contrary to the defendant's argument, the weight of authority supports the proposition that the common-law doctrine of transferred intent may be applied when the defendant's actual mental state and wrongful conduct are equivalent to the mental state and wrongful conduct that must be proved under the offense with which he is charged, even if that offense is more serious than the contemplated offense. The defendant's argument to the contrary ultimately is grounded not in the doctrine of transferred intent, but in principles governing the excuse of ignorance. See 1 W. LaFave & A. Scott, supra, § 5.1, pp. 581–84 (discussing cases where "because of ignorance or mistake of fact or law, the defendant is unaware of the magnitude of the wrong he is doing"). That excuse is not available, however, where "sound policy reasons [exist] for, in effect, imposing strict liability as to certain elements of particular crimes." Id., p. 583. For the policy reasons discussed part I A of this opinion, we have concluded that ignorance of the victim's age is not a defense to a charge under § 53a-54b (8).

As we have noted, murder of a person under the age of sixteen in violation of § 53a-54b (8) requires proof of the same mental state, namely, intent to kill, and culpable conduct, namely, the killing of a person under the age of sixteen, as causing the death of a person when acting with intent to kill another person in violation of § 53a-54a when the victim happens to be under the age of sixteen. The evidence presented at trial was, as the defendant concedes, sufficient to establish that, acting with the intent to kill another person, he caused the death of a third person under the age of sixteen. Thus, as we have stated, his state of mind and his conduct were equivalent to those that must be proved under § 53a-54b (8). Accordingly, the application of the doc-

trine of transferred intent under the circumstances of this case would not be barred under the common law.[25]

We conclude that the trial court properly instructed the jury that it could apply the doctrine of transferred intent to convict the defendant of capital felony under § 53a-54b (8).

C

The defendant also asks this court, in the event that it rejects the foregoing claims, to exercise its supervisory

---

[25] We note that some scholars have recognized a limitation on the common-law doctrine of transferred intent when the defendant was not even negligent with respect to the actual victim. See 1 W. LaFave & A. Scott, supra, § 3.12, pp. 400–401 ("[i]t has sometimes been argued . . . that 'the plain man's view of justice' requires that the notion of transferred intent in the criminal law be limited to those cases where the defendant was negligent as to the actual victim"); id., p. 401 n.48, citing G. Williams, Criminal Law: The General Part (2d Ed. 1961) p. 133. This is because it is considered to be unduly harsh to impose a severe penalty on a defendant who could not have foreseen that a person other than the intended victim would be harmed. See 1 W. LaFave & A. Scott, supra, p. 401; see also D. Karp, supra, 78 Colum. L. Rev. 1271 ("[i]t is not clear that great [public] resentment would invariably be aroused, beyond that aroused by the attempted offense against the intended victim, if the harm to the actual victim were a purely accidental result of the offender's conduct"); cf. J. Smith & B. Hogan, Criminal Law (5th Ed. 1983) pp. 63–64 (rejecting suggestion that doctrine should be limited by presence of negligence with respect to victim); W. Prosser, "Transferred Intent," 45 Tex. L. Rev. 650, 662 (1966-1967) ("in cases of intentional wrong the law will be considerably more liberal to the [injured party] in finding liability for [unintended] consequences"). We need not consider in the present case whether the common law imposes such a limitation on the doctrine and, if so, whether that limitation would also apply to § 53a-54a, however, because, even if it is assumed that such a limitation exists, the defendant in this case clearly was at least negligent with respect to the victim. Likewise, we need not consider in this case whether the common-law doctrine of transferred intent applies when the defendant has mistakenly, rather than accidentally, killed an unintended victim. See P. Robinson, supra, 93 Yale L.J. 648–49 (discussing different rules for mistaken and accidental killings under Model Penal Code and indicating that, when killing was mistaken, defendant can be convicted only of offense with which he would have been charged if he had killed intended victim). Finally, because this case does not involve the death penalty, any constitutional limitations on the doctrine in that context are left for another day.

powers to hold that, in cases where the defendant is a nonshooting defendant and the intended victim is over the age of sixteen, the defendant cannot be convicted of capital felony if the actual victim is under the age of sixteen. Historically, the exercise of this court's supervisory powers has been limited to the adoption of judicial procedures required for the fair administration of justice.[26] We never have invoked these powers to pronounce on a rule of substantive law, much less to overrule a substantive legislative enactment, and we decline to engage in such an extraordinary—and almost certainly unlawful—exercise of our authority in the present case.

## II

## THE CONSTITUTIONALITY OF § 53a-54b (8)

The defendant claims that § 53a-54b (8) is unconstitutional because (1) the penalty of life imprisonment is

[26] "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process." (Citations omitted; internal quotation marks omitted.) *State* v. *Valedon*, 261 Conn. 381, 386, 802 A.2d 836 (2002). "[O]ur supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . *State* v. *Pouncey*, 241 Conn. 802, 812–13, 699 A.2d 901 (1997). Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. See *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998) ([o]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts); *State* v. *Coleman*, 242 Conn. 523, 540, 700 A.2d 14 (1997) ([w]e previously have exercised our supervisory powers to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole)." (Internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 439, 773 A.2d 287 (2001). "[E]ven a sensible and efficient use of the supervisory power . . . is invalid if it conflicts with constitutional or statutory provisions." (Internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 451, 797 A.2d 1088 (2002).

disproportionate to the crime of killing a person under the age of sixteen in violation of the eighth and fourteenth amendments to the United States constitution and article first, §§ 8 and 9, of the Connecticut constitution, and (2) it violates the equal protection clause of the fourteenth amendment to the United States constitution and article first, §§ 1 and 20, of the Connecticut constitution. We reject these claims.

The defendant concedes that he did not preserve these constitutional claims, but seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). See footnote 16 of this opinion. We conclude that the record is adequate for review and the claims obviously are of constitutional magnitude. Accordingly, the claims are reviewable. Nonetheless, the defendant may not prevail on the merits of his claims.

The standard of review governing challenges to the constitutionality of a statute is well established. "[T]he party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality. . . . The burden of proving unconstitutionality is especially heavy when . . . a statute is challenged as being unconstitutional on its face." (Internal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 407, 680 A.2d 147 (1996).

## A

We first consider whether § 53a-54b (8) is unconstitutional under the eighth amendment. It is important to note that the defendant's claim does not require us to consider the constitutionality of a death sentence for the murder of a person under the age of sixteen, but of a sentence of life imprisonment. The United States Supreme Court has held that, although the eighth amendment "contains a narrow proportionality princi-

ple that applies to noncapital sentences"; (internal quotation marks omitted) *Ewing* v. *California*, 538 U.S. 11, 20, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003) (plurality opinion); it "does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are grossly disproportionate to the crime." (Internal quotation marks omitted.) Id., 23. "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences [will be] exceedingly rare." *Rummel* v. *Estelle*, 445 U.S. 263, 272, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980).

The governing principle that, to be unconstitutional, a sentence must be grossly disproportionate to the offense, is informed by four subsidiary principles. *Ewing* v. *California*, supra, 538 U.S. 23, citing *Harmelin* v. *Michigan*, 501 U.S. 957, 1001, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) (Kennedy, J., concurring). First, "the fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter, is properly within the province of legislatures, not courts." (Internal quotation marks omitted.) *Harmelin* v. *Michigan*, supra, 998. Second, "the Eighth Amendment does not mandate adoption of any one penological theory." Id., 999. Rather, "[t]he federal and state criminal systems have accorded different weights at different times to the penological goals of retribution, deterrence, incapacitation, and rehabilitation." Id. "Third, marked divergences [among the different states] both in underlying theories of sentencing and in the length of prescribed prison terms are the inevitable, often beneficial, result of the federal structure." Id. "Thus, the circumstance that a State has the most severe punishment for a particular crime does not by itself render the punishment grossly disproportionate," even if the state treats the crime more severely than any other state. Id., 1000. Moreover, a comparison of the sentence under

review with sentences for other crimes, both within the jurisdiction and in other states, is "appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." Id., 1005. Fourth, reviewing courts "should be informed by objective factors to the maximum possible extent." (Internal quotation marks omitted.) Id., 1000. As a general matter, "[t]he most prominent objective factor is the type of punishment imposed." Id. Thus, "[t]he easiest comparison . . . is between capital punishment and noncapital punishment . . . ." (Internal quotation marks omitted.) Id., 1000–1001. "By contrast, [courts] lack clear objective standards to distinguish between sentences for different terms of years." Id., 1001.

Applying these principles to the defendant's claim that a sentence of life imprisonment for the intentional murder of a person under the age of sixteen is constitutionally disproportionate, we conclude as a threshold matter that the harshness of the penalty is not grossly disproportionate to the gravity of the offense. Compare *Solem* v. *Helm*, 463 U.S. 277, 296, 303, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983) (life sentence for habitual offender charged with uttering "no account" check for $100, "one of the most passive felonies a person could commit," was significantly disproportionate and violated eighth amendment) with *Harmelin* v. *Michigan*, supra, 501 U.S. 1005 (sentence of life imprisonment without possibility of parole for possession of more than 650 grams of cocaine was not grossly disproportionate on its face). It is self-evident, as even the defendant concedes, that intentional murder is the most serious criminal offense with which a defendant can be charged. Thus, there is no call to second-guess the legislature's judgment that murder merits the harshest penalty, particularly when the legislature has limited that penalty to what it consid-

ers to be the most heinous murders. Accordingly, we need not consider, as the defendant urges us to do, whether the murder of a person under the age of sixteen is *as* heinous as the other capital felonies enumerated in § 53a-54b. Nor are we required to engage in an extended comparative analysis of this sentence with sentences for other crimes in this state or elsewhere, or to analyze the penological purposes of the statute. See *Harmelin* v. *Michigan*, supra, 1005 (when sentence is not grossly disproportionate on its face, comparative analysis of sentence with other sentences need not be performed); id., 1004 ("a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate" [internal quotation marks omitted]).

The defendant also claims that the mandatory nature of the sentence of life imprisonment under § 53a-54b (8) makes the statute unconstitutional as applied to him because of what he characterizes as his relatively minor involvement in, and the relatively unaggravated nature of, the killing. There is, however, no constitutional requirement for individualized sentencing outside the death penalty context. Id., 994–95 (majority opinion). Accordingly, we conclude that a mandatory sentence of life imprisonment for the murder of a person under the age of sixteen does not violate the eighth amendment.

### B

The defendant also claims that § 53a-54b (8) violates constitutional equal protection principles because it treats the class of defendants who have murdered children under the age of sixteen differently than the class of defendants who have murdered adults.[27] "When a

---

[27] "[T]he analytical predicate [for consideration of an equal protection claim]" is a determination of whether the allegedly disparately treated groups are similarly situated. (Internal quotation marks omitted.) *State* v. *Wright*, 246 Conn. 132, 141, 716 A.2d 870 (1998). In the present case, we assume without deciding that the class of defendants who have intentionally mur-

statute is challenged on equal protection grounds . . . the reviewing court must first determine the standard by which the challenged statute's constitutional validity will be determined. If, in distinguishing between classes, the statute either intrudes on the exercise of a fundamental right or burdens a suspect class of persons, the court will apply a strict scrutiny standard [under which] the state must demonstrate that the challenged statute is necessary to the achievement of a compelling state interest. . . . If the statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose in order to withstand an equal protection challenge." (Internal quotation marks omitted.) *Ramos* v. *Vernon*, 254 Conn. 799, 829, 761 A.2d 705 (2000).

The defendant argues that he has a fundamental right to liberty and, accordingly, § 53a-54b (8) should be subject to strict scrutiny. We rejected an identical claim by the defendant in *State* v. *Wright*, 246 Conn. 132, 137–38, 716 A.2d 870 (1998), however, concluding that a person who has been convicted of a criminal offense " 'is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual . . . and so long as the penalty is not based on an arbitrary distinction . . . .' " Id., quoting *Chapman* v. *United States*, 500 U.S. 453, 465, 111 S. Ct. 1919, 114 L. Ed. 2d 524 (1991). In other words, the state is not required to provide compelling reasons for imposing different punishments for different offenses. Accordingly, we subject the defendant's claim to rational basis review.

dered persons under the age of sixteen is similarly situated to the class of defendants who have intentionally murdered adults. See id., 143 (this court frequently has assumed arguendo that categories of defendants are similarly situated with respect to challenged statute) and cases cited therein.

We conclude that the legislature's decision to classify the intentional murder of a person under the age of sixteen as a capital felony has a rational basis. As we recognized in part I of this opinion, the state has a legitimate interest in protecting the lives of the "most defenseless of our citizens" and "the most vulnerable." 38 S. Proc., Pt. 3, 1995 Sess., pp. 854, 861, remarks of Senator Thomas F. Upson during the debate on the bill ultimately enacted as § 53a-54b (8).[28] That interest rationally is advanced by holding offenders who intentionally kill innocent persons liable for capital felony if their victims are under the age of sixteen. The fact that the state is not required to prove that the defendant knew that the victim was under the age of sixteen does not affect our conclusion. As we have noted, by providing that intentional killers take their victims as they find them, the legislature has created a strong incentive for potential killers to avoid even the risk of killing a child.[29]

We also reject the defendant's claim that there is no rational basis for the line drawn between victims who are sixteen or older and victims under the age of sixteen. We previously rejected a similar claim based on an alleged arbitrary age classification of potential victims, noting that "the same claim can be raised against any statute that draws a precise line based on age." (Internal quotation marks omitted.) *State* v. *Jason B.*, 248 Conn. 543, 560, 729 A.2d 760, cert. denied, 528 U.S. 967, 120 S. Ct. 406, 145 L. Ed. 2d 316 (1999). "[L]egislatures often must draw arbitrary lines . . . ." *Mendillo* v. *Board of*

---

[28] See also footnote 14 of this opinion.

[29] We note that, in *Black* v. *State*, 26 S.W.3d 895, 898 (Tex. Crim. App. 2000), the court considered a similar challenge to the constitutionality of a Texas statute making the murder of a child a capital felony, regardless of whether the defendant knew the victim's age, and reached the same conclusion, reasoning that "[t]he safety of children provides a sufficient rationale to permit the legislature to hold offenders liable when they intentionally or knowingly kill and the victim is a young child."

*Education*, 246 Conn. 456, 486, 717 A.2d 1177 (1998). "When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." *Louisville Gas & Electric Co.* v. *Coleman*, 277 U.S. 32, 41, 48 S. Ct. 423, 72 L. Ed. 770 (1928) (Holmes, J., dissenting). "[I]n every instance where a line must be drawn or a cutoff established there are those who fall directly on either side. . . . [W]e cannot, for this reason, find the act unreasonable in its purpose and overall effect. . . . If a conceivable rational basis exists for the distinction, then the classification passes constitutional muster." (Citation omitted; internal quotation marks omitted.) *United Illuminating Co.* v. *New Haven*, 179 Conn. 627, 645, 427 A.2d 830, appeal dismissed, 449 U.S. 801, 101 S. Ct. 45, 66 L. Ed. 2d 5 (1980).

The defendant in the present case argues that the age classification created by § 53a-54b (8) is irrational because it fails to focus on the special vulnerabilities of children up to the age of six, who are still in the home and subject to domestic abuse, or on the vulnerabilities of children who are still in school, as most children leave school at the age of eighteen, or on the vulnerabilities of those who have the legal status of minors. See General Statutes § 1-1d (defining minor as person under age of eighteen). Thus, the defendant does not argue that the age of sixteen is simply too old—as,

perhaps, the age of thirty might be—and therefore too overinclusive, or too young and therefore too underinclusive, rationally to advance the legislative purpose of protecting young persons. Rather, he suggests that the line is arbitrary because it might have been drawn anywhere between the ages of six and eighteen and still serve some legitimate legislative purpose. This is precisely the type of situation, however, in which line drawing must be left to the legislature. To invalidate the legislature's choice, "we would either have to hold that the Legislature cannot draw an age line—which would eviscerate any attempt to include child-murders within the ambit of the capital murder statute—or we would have to hold that the line should be drawn elsewhere—in which case, we would merely be legislating from the bench." *Henderson* v. *State*, 962 S.W.2d 544, 562–63 (Tex. Crim. App. 1997), cert. denied, 525 U.S. 978, 119 S. Ct. 437, 142 L. Ed. 2d 356 (1998). We decline to pursue either option. Accordingly, we conclude that § 53a-54b (8) does not violate the equal protection clause of the federal constitution.

## III

## CONSISTENCY OF THE VERDICT

The defendant claims that he was convicted improperly of four offenses requiring proof of three separate levels of intent because the states of intent are mutually exclusive.[30] Specifically, the defendant claims that,

---

[30] The state argues that this claim is unpreserved, but concedes that it is reviewable under *State* v. *Golding*, supra, 213 Conn. 239–40. See *State* v. *Hinton*, supra, 227 Conn. 314 (defendant has due process right to have every element of offense proven and lack of consistency bears directly on essential element of intent).

The defendant, relying on *State* v. *Torres*, 47 Conn. App. 205, 703 A.2d 1164 (1997), also claims that the state did not present sufficient evidence to establish that he had all three levels of intent. In *Torres*, there was an ambiguity, in a count charging the defendant with attempt to commit assault in the first degree, as to whom the defendant had intended to injure. Id., 213. The Appellate Court concluded that the defendant reasonably could have concluded that the information charged him with intent to injure the

because he was convicted of all the offenses under the doctrine of transferred intent,[31] he necessarily was found to have had three separate states of intent toward the intended victim, and he could not simultaneously have intended to kill him, as required under § 53a-54a, intended to inflict serious physical injury on him, as required under § 53a-59 (a) (1), and intended to inflict physical injury on him as required under § 53a-59 (a) (5). We disagree.

In support of his claim, the defendant, following this court's methodology in *State* v. *Hinton*, supra, 227 Conn. 314–21,[32] presents a tangled web of possible fac-

---

actual victim of the assault, who, although injured, had not been seriously injured as is required for a conviction under the statute that the defendant was charged with violating. Id., 218. The court also concluded that there was no evidence that the defendant had intended to injure that person. Id., 220. Accordingly, the court reversed the conviction. Id., 225. Thus, *Torres* merely stands for the proposition that the state must present evidence in support of each element of the offense with which the defendant is charged. Contrary to the defendant's claim, it does not stand for the proposition that, when a defendant has been charged with an offense requiring an intent to kill and an offense requiring an intent to cause physical injury to the same person, the state must present separate evidence of his intent to cause physical injury. Instead, as we discuss later in this opinion, the inference that the defendant intended to cause physical injury necessarily follows from the determination that the defendant had an intent to kill. *State* v. *Murray*, 254 Conn. 472, 483, 757 A.2d 578 (2000). Accordingly, we reject this claim.

[31] Counts two and three of the information alleged that the defendant committed assault in the first degree in violation of § 53a-59 (a) (1), when, "with the intent to cause serious physical injury to another person, did intentionally aid his accomplice, Dennis Smith, who did cause such injury to a third person . . . ." Count four alleged that the defendant committed assault in the first degree in violation of § 53a-59 (a) (5), when, "with the intent to cause physical injury to another person, did intentionally aid his accomplice, Dennis Smith, who did cause such physical injury to a third person . . . ."

[32] In *Hinton*, the defendant was convicted of attempt to commit murder and reckless assault with respect to the same person. Recognizing that "a defendant could not be convicted of both attempted murder . . . and reckless assault . . . for a single act against a single victim"; *State* v. *Hinton*, supra, 227 Conn. 319; we concluded that the verdict was legally inconsistent. Id., 320.

tual scenarios positing various levels of intent that the jury might have found the defendant to have had with respect to the intended victim and speculating as to how those respective levels of intent might be inconsistent with the level of intent required by each of the various offenses with which he was charged. Unaccountably, the defendant simply ignores the fact that *he was convicted of murder* and, therefore, the jury necessarily found that he had had the intent to kill Corey Hite. He also disregards the fact that his conviction on the assault counts was for intentional assault under the doctrine of transferred intent, not for reckless assault, as in *Hinton*. It is well established that "a defendant may simultaneously possess the intent to cause death and the intent to cause serious physical injury." *State* v. *Williams*, 237 Conn. 748, 753–54, 679 A.2d 920 (1996); see also *State* v. *Murray*, 254 Conn. 472, 483, 757 A.2d 578 (2000) ("one cannot intend to cause death without necessarily intending to cause physical injury"). Accordingly, it was not inconsistent for the jury in the present case to find that the defendant simultaneously had both the intent to kill and the intent to inflict physical injury on Corey Hite.

The defendant also argues, however, that, even if the intent to kill and the intent to inflict physical injury on a single person are not inconsistent, a different rule should apply when the intended victim was neither injured nor killed. This argument is meritless. If a defendant may be convicted of attempted murder and assault in the first degree with respect to a single victim because the defendant harbors both the intent to kill and the intent to inflict serious injury on that victim; see *State* v. *Williams*, supra, 237 Conn. 753–54; we can perceive no reason, and the defendant has not explained, why both of those separate intents may not be transferred to different third persons so as to support the defendant's conviction of both murder and assault. Indeed, both

the intentional murder statute, as we stated in part I B of this opinion, and the assault statute specifically provide for such a transfer of intent. See General Statutes § 53a-59 (a) (providing in subdivisions [1], [2], [4] and [5] that when defendant has intent to injure another person, he is guilty of assault if he causes such injury to such person or to third person). Accordingly, we reject this claim.

IV

THE PRESENCE OF CORRECTION OFFICERS IN THE COURTROOM

Finally, we consider the defendant's claim that the presence of uniformed correction officers in the courtroom during jury selection and trial deprived him of a fair trial. We disagree.

The following additional facts are relevant to this claim. On May 11, 2000, during jury selection, defense counsel brought to the court's attention that the department of correction had changed security procedures and had posted correction officers in the courtroom. Defense counsel also advised the court that he intended to inquire with the prison warden whether the officers could appear in the courtroom in plain clothes. On May 15, 2000, defense counsel again raised the issue of the correction officers to the trial court. He noted that the officers sat close behind the defendant, wore distinctive uniforms and had correction department patches on their sleeves. He argued that their presence in the courtroom interfered with the defendant's presumption of innocence and his right to a fair trial. He also noted that the defendant had not received any disciplinary tickets while in prison and that he had behaved appropriately in the courtroom. The court asked defense counsel to file a brief on the issue.

On May 16, 2000, defense counsel filed a brief in which he argued that the presence of uniformed officers

wearing large utility belts with handcuffs, pepper spray and, occasionally, empty gun holsters, was, in light of the defendant's good prison record, unnecessary and prejudicial. The trial court heard arguments on the brief on May 17, 2000. At the hearing, defense counsel reiterated his view that the presence of the uniformed officers was prejudicial and asked the court to order the officers to sit out of view of the jury or to come to court in plain clothes. The state made no objection to the defendant's request. After noting that the officers had been extremely polite and that their demeanor in the courtroom had been appropriate, the court denied the defendant's request.

The trial commenced on May 30, 2000. On May 31, after testimony by two witnesses, it was brought to the court's attention that one of the jurors had become upset. The court asked that the juror be brought into the courtroom and questioned her in the presence of counsel for the defendant and the state's attorney. The juror indicated that she had become upset after hearing the clicking of the sheriff's handcuffs.[33] She stated that the noise had reminded her of her husband, who was in jail for committing an offense that had victimized her in some way. The juror also indicated that she believed that the defendant was incarcerated and the handcuffs were going to be used on him. Her belief that the defendant was incarcerated apparently had caused the juror to fear that the defendant might inform her husband that she was serving on the jury and that this might jeopardize her safety. The juror stated that she had mentioned her belief that the defendant was incarcerated to one other juror. After conferring with counsel, the trial court dismissed the juror who had become upset from the jury.

---

[33] The dismissed juror indicated that she had heard the clicking of "the sheriff's" handcuffs. Defense counsel indicated during his argument on his motion for a mistrial, however, that, while discussing this matter with the trial court, the juror had pointed to one of the correction officers.

The court then canvassed all of the remaining jurors to determine which of them might have heard the dismissed juror's remark about the defendant's incarceration. One juror stated that she had overheard the dismissed juror saying that she had seen the defendant in handcuffs,[34] but she could not recall to whom the juror had been speaking. The court instructed the juror that she was not to consider the defendant's custodial status in determining his guilt, that the defendant was entitled to the presumption of innocence and that she was not to speak to any of the other jurors about the matter. The juror assured the judge that she could disregard the remark by the dismissed juror and that she would not discuss the matter with anyone. All of the other jurors denied having heard any remarks by the dismissed juror concerning the defendant or the case.

After the court completed its canvass of the jurors, defense counsel moved for a mistrial. He reminded the court that he previously had raised concerns about the presence of correction officers in the courtroom. He also noted that that the statements of the jurors during the canvass had been inconsistent, in that one juror had told the court that she had *overheard* the dismissed juror's remark about the defendant's being handcuffed, but none of the other jurors had indicated that the dismissed juror had made such a remark. The state's attorney argued that the dismissed juror's personal difficulties were irrelevant to the ability of the remaining jurors to be impartial. Furthermore, the juror who had heard the dismissed juror's remark that the defendant had been handcuffed had emphatically assured the court that she would not let that fact affect her judgment. The court noted that the defendant had never

---

[34] We note that the dismissed juror had not stated to the trial court that she had seen the defendant in handcuffs, but that, when she heard the clicking of the handcuffs, she concluded that they would be used on the defendant.

been handcuffed in the courtroom, the correction offi-
cers were sitting ten to twelve feet behind the defen-
dant, the dismissed juror's strong reaction to the
handcuffs was a result of her particular circumstances,
and, on the basis of the court's personal observation
of the remaining jurors, it had no reason to believe
that they would consider the custodial status of the
defendant in reaching their decision. Accordingly, the
court denied the defendant's motion for a mistrial. The
court also offered to give an additional instruction to
the jurors concerning the defendant's custodial status.
Defense counsel declined the offer.

The defendant argues that his right to a fair trial was
prejudiced by the presence of the correction officers
in the courtroom and, therefore, that the trial court
improperly denied his request for a mistrial.[35] "The stan-
dard for review of an action upon a motion for a mistrial
is well established. While the remedy of a mistrial is
permitted under the rules of practice, it is not favored.
[A] mistrial should be granted only as a result of some
occurrence upon the trial of such a character that it is
apparent to the court that because of it a party cannot
have a fair trial . . . and the whole proceedings are
vitiated. . . . If curative action can obviate the preju-
dice, the drastic remedy of a mistrial should be avoided.
. . . On appeal, we hesitate to disturb a decision not
to declare a mistrial. The trial judge is the arbiter of
the many circumstances which may arise during the
trial in which his function is to assure a fair and just
outcome. . . . The trial court is better positioned than
we are to evaluate in the first instance whether a certain
occurrence is prejudicial to the defendant and, if so,

---

[35] The defendant suggests that the trial court abused its discretion both by
denying his request during jury selection that the court order the correction
officers to sit out of view of the jury or to wear plain clothes and by denying
his motion for a mistrial after one juror concluded that the defendant was
incarcerated and made a remark to that effect that was overheard by another
juror. Because the latter claim is dispositive, we limit our review to that claim.

what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court." (Citations omitted; internal quotation marks omitted.) *State* v. *Taft*, 258 Conn. 412, 418, 781 A.2d 302 (2001).

Whether the presence of security personnel in a courtroom during trial was so prejudicial to the defendant as to deprive him of his right to a fair trial is decided on a case-by-case basis. See *Holbrook* v. *Flynn*, 475 U.S. 560, 569, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986). It is not "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." Id., 568–69. "The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence." Id., 569.

"Whenever a courtroom arrangement is challenged as inherently prejudicial . . . the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether an unacceptable risk is presented of impermissible factors coming into play . . . ." (Citation omitted; internal quotation marks omitted.) Id., 570. In making that determination, the reviewing court considers whether the presence of security personnel "tended to brand [the defendant in the jury's] eyes with an unmistakable mark of guilt";

(internal quotation marks omitted) id., 571; or whether, instead, the jury was likely to have taken their presence as a sign of "a normal official concern for the safety and order of the proceedings." Id. The court also must weigh any prejudice to the defendant against the state's legitimate need to maintain custody during the proceedings over a defendant who has been denied bail. Id. "[I]f the [presence of the officers] is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." Id., 572.

The defendant argues that, because the dismissed juror inferred from the presence of officers with handcuffs that the defendant was incarcerated, the presence of the correction officers was as prejudicial to the defendant as shackling would have been. Accordingly, he argues that the standards governing shackling should apply and that, under that standard, the trial court's denial of the motion for a mistrial was improper. See id., 568–69 (shackling is inherently prejudicial and "should be permitted only where justified by an essential state interest specific to each trial").

We disagree that the standards governing the shackling of a defendant apply in the present case. We also conclude that, under the case-by-case standard set forth in *Holbrook* v. *Flynn*, supra, 475 U.S. 568–71, the trial court did not abuse its discretion in denying the motion for a mistrial. As the trial court recognized, the dismissed juror had a personal history that made her particularly sensitive to the presence of the correction officers and to the significance of the handcuffs. Thus, her inference that the defendant was incarcerated was not an inference that a typical juror was likely to make. In any event, the concern with shackling is not that it may lead to the inference that a defendant is incarcerated, but that it may raise an inference that the defendant is a danger to those attending the trial or is a high escape risk. Although reasonable care should be taken

to prevent the jury from learning a defendant's custodial status, a juror's knowledge of that status is not as prejudicial to the defendant as the inferences to be drawn from his shackling.

With the exception of the single juror who had overheard the dismissed juror's remark that the defendant had been handcuffed, there was no evidence that the other jurors saw the presence of the officers as anything other than a show of force intended to keep order in the courtroom. The court noted that the two correction officers were seated twelve feet away from the defendant and that their demeanor was polite and appropriate. It also noted that the defendant had not been handcuffed within view of the jurors. In *Holbrook* v. *Flynn*, supra, 475 U.S. 571, the court concluded that the presence of four uniformed officers sitting quietly in the first row of the courtroom's spectator section was not unfairly prejudicial. Moreover, the trial court in the present case gave a corrective instruction to the juror who had overheard the remark about the handcuffs and the juror assured the trial court that she would disregard it and that she would not consider the defendant's custodial status in making her determination of the defendant's guilt.

Considering all of these circumstances, we conclude that the presence of two uniformed correction officers in the courtroom for the legitimate purpose of ensuring the defendant's presence during the proceedings did not tend to "brand [the defendant in the jury's] eyes with an unmistakable mark of guilt"; (internal quotation marks omitted) id.; and he has not shown the existence of any actual prejudice. Accordingly, we conclude that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial.

The judgment is affirmed.

In this opinion the other justices concurred.